Holder v. State.

## LEE HOLDER *v.* STATE.*

## (*Jackson.* Special September Term, 1907.)

1.  **CIRCUMSTANTIAL EVIDENCE.** Sufficient to sustain conviction of murder in the first degree.

    Circumstantial evidence stated, considered, and held sufficient to exclude every hypothesis but that of guilt, and to sustain a conviction of murder in the first degree. (*Post, pp.* 181-209.)

2.  **CRIMINAL LAW.** Motive need not be proved when guilt is clear; motives remove doubts and strengthen the case when necessary.

    If the proof of guilt be clear, it is not necessary to prove a motive, in the ordinary meaning of that term. If a homicide is committed through the promptings of a wicked and depraved heart, it is not essential that the State should prove grudge, or quarrel, or incitement of cupidity, or jealousy, or other special thing that proximately aroused the lethal purpose. Proof of motive strengthens the State's case when strength is needed, and tends to dissipate doubts when doubts have been engendered. (*Post, pp.* 199, 200.)

3.  **ALIBI.** Evidence insufficient to sustain.

    Evidence stated, considered, and held insufficient to establish an alibi, because inherently inconsistent, contradictory, and incredible, and overwhelmed by the testimony of the guilt of the accused. (*Post, pp.* 203-209.)

4.  **EVIDENCE.** Recognition of a certain horse by the sound of his feet in a lope; nonexpert testimony as to identity.

    A nonexpert witness may give his opinion as to the identity of things; and a witness who testifies in a criminal case, that he

---

*As to admissibility in criminal case of evidence of other crime, see note to People v. Molineux (N. Y.), 62 L. R. A., 193.

Holder v. State.

is familiar with the sound of a certain horse's feet when going in a lope over a bridge near his home, from having often seen and heard that horse lope over the bridge, may testify as to his recognition of the horse from the identity of the footsteps he heard with those of the horse in question. (*Post, pp.* 209, 210.)

Case cited and approved: Railroad v. Hunton, 114 Tenn., 609.

5. **SAME. Of** previous attempts to kill is admissible to show the intent.

In a prosecution for a patricide, evidence tending to show previous attempts by the accused on the life of the deceased and other members of the family is admissible and relevant for the purpose of exhibiting the animus or state of mind of the accused towards the deceased, as indicating hostility or settled purpose to harm or injure the deceased. The said evidence being competent to show the intent, it is not incompetent on the ground that it tends to show the commission of a distinct and independent crime. (*Post, pp.* 210-217.)

Case cited and approved: Williams v. State, 8 Humph., 585, 593, et seq.

6. **SAME. Witness impeached by expression of opinion implying statement of fact clearly in conflict with his testimony.**

A witness may be impeached by proof of an expression made by him in the form of an opinion implying the statement of a fact clearly in conflict with his testimony; as, where, in a prosecution for a patricide, the mother of the accused testified in his behalf in support of an alibi, and, in answer to a proper question laying grounds for an impeachment, denied that shortly after the killing, in a conversation with certain parties at a certain place and time, she asked if it could be possible that she had raised a boy that would kill his father, and, in response to a suggestion that perhaps he did not, replied that she would have to admit that he did it, the State was entitled to contradict

Holder v. State.

and impeach her testimony in support of the alibi by proving in rebuttal that she in fact expressed such opinion. (*Post, pp,* 217-228.)

Cases cited and approved: Scott v. State (Tex. Cr. App.), 93 S. W., 112: Watson v. State (Tex. Cr. App.), 95 S. W., 115, 116; Barbee v. State (Tex. Cr. App.), 97 S. W., 1058; State v. Kingsbury, 58 Me., 238; Commonwealth v. Wood, 111 Mass., 411; Mayer v. People, 80 N. Y., 377; State v. Baldwin, 36 Kan., 14; Schell v. Plumb, 55 N. Y., 599.

Cases cited and distinguished: Saunders v. Railroad, 99 Tenn., 130; Franklin v. Commonwealth, 105 Ky., 237.

7. **BILLS OF EXCEPTIONS.** Court's charge and refusal of continuance cannot be reviewed when not embraced therein.

Where the bill of exceptions does not include the charge of the court nor the affidavit for a continuance, errors assigned upon the charge and for the trial court's refusal to grant a continuance cannot be considered or reviewed on a writ of error. (*Post, p.* 228.)

---

FROM OBION.

---

Writ of error to the Circuit Court of Obion County.— JOSEPH E. JONES, Judge.

RICE A. PIERCE and JOSEPH L. FRY, for Holder.

ATTORNEY-GENERAL CATES, for State.

MR. JUSTICE NEIL delivered the opinion of the Court.

The plaintiff in error was indicted in the circuit court of Obion county for the murder of his father, Rev. B. L. Holder, and was convicted and sentenced to be hanged. Against this judgment he has sued out a writ of error in this court, and has prayed that the sentence be reviewed.

The errors assigned are upon certain rulings of the circuit court in the admission of testimony and upon the sufficiency of the evidence to sustain the verdict. Passing for the present the first class of questions, we shall proceed at once to the case made by the evidence.

About ten o'clock on the night of December 27, 1906, Warren Brown, a colored man, returning to his home from the town of Troy, in Obion county, saw, on the public road leading from Troy eastward to Rives in the same county, a horse and buggy, down in a depression on the south side of the road at the west end of a bridge, about one mile east of Troy; the buggy overturned and the horse entangled in the harness. He at once proceeded to the homes of two men nearby, Luther Lancaster and A. A. Everton, and reported his discovery. Mr. Everton and Charles Lancaster, the son of Luther Lancaster, accompanied Brown back to the bridge, and a more particular investigation was then made; but nothing further was ascertained, except that a laprobe was found under the overturned buggy, and that the horse was probably that of Rev. B. L. Holder. The horse was extricated from the harness, and was

then ridden by Charles Lancaster to the home of Mr. Holder. His wife and children were aroused, and they at once identified the horse as the property of the husband and father. All of them, as soon as they could put on their clothing, returned with Charles Lancaster to the scene of the disaster, which was only about 1,100 yards from their house, and on the same road on which they lived. On the way they were joined by some of the neighbors, and soon quite a crowd of people gathered in, some from Troy; the news having been quickly disseminated by telephone.

It appeared that on that afternoon, shortly before six o'clock, Rev. B. L. Holder had left his home to go to Troy, something more than a mile distant, to attend a Masonic meeting. He did not reach Troy, and did not return home. His horse and buggy were found in the predicament above mentioned at ten o'clock that night, and the family and the neighbors began their search for him. The night was cloudy, and it was raining a little; but the darkness was somewhat relieved by the moon, which now and then shone through the clouds. The searchers had lanterns, and they explored the sides of the road between the fences, on each side, and to some extent the fields to the north and south, but not thoroughly, and nothing was discovered. About daylight, however, one of the party saw, about sixty yards away, within the south field, an object which, at that distance and in that light, presented to some the appearance of a low stump; but, as it was known there

were no stumps in that field, it was at once conjectured to be the body of Mr. Holder. Mrs. Holder, indeed, said she could discern the overcoat which he wore when he left home the night before. All went over into the field, and it was soon placed beyond doubt that it was indeed the body of the missing man.

On an inspection of the body, made soon after, it was discovered that there was a gunshot wound in the right side of the abdomen, close to the waistband of the trousers, from which the bowels were protruding. There was another gunshot wound just under the heart; in each of these wounds the orifice being about the size of a silver dollar. One of the cheek bones was crushed in. The back half, or portion, of the head was crushed, so that it felt like a soft-shelled egg. There was a gash on the left side of the head through which the brains were visible. There were in all three gashes on the outside of the head. There was a slight imprint or indentation in the ground where it appeared, or seemed, his head had lain, and above the top of his head there was a hole in the ground that presented the appearance of the hole made where a stick has been stuck in the ground; and there were hair and blood all around the place. There was a considerable quantity of clotted blood on the ground, and for four or five feet around the ground was tramped, as if there had been a struggle.

Further examination disclosed that the deceased had on only one overshoe. The other overshoe was found

sticking in the mud in the edge of the branch near the overturned buggy. From this point the tracks of the deceased, plainly indicated by the track of an overshoe on one foot and the imprint of the shoe on the other foot without an overshoe, were followed to the fence, thence into the field, and through the field up to the point where his body was found. It was also discovered that there was another line of tracks running parallel with those of deceased, and that they closed in with the tracks of the deceased at the point where the body was found. The person who made this second line of tracks had crossed the fence several feet to the east of the point where deceased crossed it. Both lines of tracks showed that the men who made them were running. Both lines of tracks ran almost due south from the bridge until they neared a thicket in the field. Then the tracks of the deceased turned eastward, and presented the appearance of unsteadiness and uncertainty. At this point the tracks of the other party closed in, and intercepted those of deceased before the latter had covered more than a few feet going eastward; and here the body lay.

At the east end of the bridge there was found lying in the road an empty shell, and at the west end of the bridge another empty shell. Each of these was a No. 12 of the kind known as "New Chief," manufactured by the Western Cartridge Company for shotguns. These shells were of the size to fit a single-barreled shotgun which was owned by the deceased, and when that gun

was subsequently found there was a shell in it of the same kind.

The deceased was killed on Thursday night, December 27th. The body was discovered the next morning, Friday, the 28th, and on that day the inquest was held. After the inquest was over, the body was removed to the family home and prepared by the neighbors for interment. One of those assisting in the performance of this funeral rite was the witness W. A. Muse. After the body had been prepared, Mr. Muse suggested that a search be made for the gun. It should be here interposed that Mr. Holder, the deceased, had on the 15th of December purchased a single-barreled, breech-loading shotgun from Mr. Rochelle, a hardware merchant of Troy. He was accustomed to keep this gun in his bedroom, lying between the mattress and the cover of a bed in that room. The whole family knew where he kept it. On the afternoon of the day immediately preceding the night he was killed—that is, in the late afternoon of Thursday, December 27, 1906—Mr. Holder went out upon his farm to look for some calves and took his shotgun with him, to hunt along the way. About supper time he returned, bringing the gun with him. His wife saw him take it into the house. She did not observe where he deposited it. It does not appear that any member of the family ever saw this gun after that time until its discovery by the witness Muse, after Mr. Holder's death, unless it was seen and used by the plaintiff in error, Lee Holder. Mrs. Holder says she never

saw it again. Plaintiff in error testifies that he saw
his father go off with it in the afternoon when he went
to look for the calves, and that he saw him when he re-
turned at supper time, but that it was so dark he does
not know whether he brought the gun back or not. The
only other member of the family who testified, Earl
Holder, a boy of fourteen or fifteen years old, says
practically nothing upon the subject. There were only
two other members of the family at home—Nona, a
girl of ten and Cecil, a boy of eight. They were not
introduced.

Resuming the history of the search for the gun: After
Mr. Holder's body had been prepared for burial,
Mr. Muse, joined by some other persons, went forth to
find the gun. They were searching the barn. When
they were within three feet of the place where the gun
was subsequently found, the plaintiff in error came
near and looked at them with an expression on his face
evincing so much anger that Mr. Muse was frightened,
and for fear plaintiff in error would do him harm he
immediately ceased the search and went to the house.
The next day, Saturday, after plaintiff in error had
been placed under arrest, the search was renewed, and
about twelve o'clock the gun was found. There was a
hole in the east end of the barn, right at the ground.
The barn was weather-boarded down to the ground;
but there was a hole at the end that ran under the
building, concealed from the outside in front by the
planks. Into this hole the gun had been thrust, and

behind it, so placed as to conceal it, there was pushed in a 2 by 4 inch scantling. So covered up and hidden, the gun could not be seen from the front of the building, or from the end; but by going around on the other side of the barn, and peering under, the discovery was made.

When the gun was drawn from its place of concealment, it was found to be in the following condition: The stock was broken off, the barrel was bent in two different directions. It was rusty, and it had mud, or mud and hair, upon it, and there was blood on the end of it. It was a single-barreled, breech-loading shotgun of the make of Norvell Shapleigh Hardware Company. It was thoroughly identified as the gun of Rev. B. L. Holder by the witness Ed Turnage, who was present when Mr. Rochelle sold it to Mr. Holder. Mr. Rochelle testified to the sale of a gun of the make above mentioned to Mr. Holder on the 15th of December, and Mr. Turnage, who was present when the sale was made, identified the particular gun by a knot on the left side of the stock.

On the day immediately preceding the night on which the homicide was committed—that is, on December 27, 1906—the plaintiff in error purchased of Ed Turnage, clerk of Mr. Rochelle, a hardware merchant of Troy, a box containing 25 New Chief shotgun cartridges of size No. 12, the proper size to fit his father's gun, as already stated, and the same kind found near the bridge. Mr. Turnage does not remember the time of the day when this purchase was made, whether

morning or afternoon.   The witness W. E. Huey, how-
ever, says that on the afternoon of the 27th of De-
cember, at 4:30 o'clock, he met plaintiff in error riding.
rapidly into Troy.   He says he met him at the Troy
roller mill, which is 250 yards from the main part of
the town; that he had crossed the railroad and was:
going into town.   Probably this was the time when he
bought the box of cartridges; but, whether this be true
or not, it is certain that he bought the cartridges that
day.   Plaintiff in error does not explain this circum-
stance; indeed, he does not refer to it at all in his tes-
timony, either by way of affirmance or denial, further
than his denial that he was in Troy that afternoon may
be construed into a denial of this purchase.   In fact,.
while the people were searching for his father's body,.
the night of the homicide, he spoke doubtfully as to
whether his father owned a gun.   He said to the witness.
Muse that his father had bought a gun from Rochelle
at Troy, but that he might have carried it back; that
he did not know what he had done with it.   This state-
ment was made in the face of the fact that he saw his.
father with this gun late Saturday afternoon when he
went to look for the calves, just before supper, and he
saw his father when he started for Troy that night,.
and knew he did not take the gun with him.   The plain-
tiff in error does not deny that he made the foregoing
statement to the witness Muse.

The plaintiff in error admits that he knew on Friday,
the next day after the homicide, that he was suspected

of the murder of his father.   On that day, about twelve o'clock, he took off the shoes that he had worn the day before, and put them in a side room, not the room that he usually occupied.   He says that when he changed his shoes he did not then know that he was under suspicion.   However, the shoes were changed.   These shoes were called for by the witness Andrew Harrison, and handed to him by Earl Holder, the young brother of the plaintiff in error.   They are thoroughly identified as the shoes which the plaintiff in error wore on the 27th of December, and on the morning of the 28th, when the peope were searching for the body.   These facts are practically admitted in the plaintiff in error's testimoney, and that these were the same shoes he wore while the search for the body was proceeding was substantially proven by other witnesses.

These shoes were peculiar, in that the left one was run down on the inside.   After the body of the deceased was found, and while the people were still in the field where it lay, the attention of several of the party was drawn to the similarity of the tracks then made by the plaintiff in error to those made by the assailant of the deceased, and two or more of the party marked the plaintiff in error's tracks, those he made that morning, by sticking little sticks in them for future examination and comparison.   The tracks of the assailant, as we have already said, paralleled those of the deceased until they come together at the point where the deceased fell.   From this point the tracks

of the assailant were plainly traceable as they led out of the field to the fence, which he got over at a point twenty or thirty feet east of where he entered. These tracks made by the assailant were compared with those which were made by the plaintiff in error in the field on Friday morning (the ground being soft both Thursday night and Friday morning), and were found to be in all respects similar. When the shoes were procured, they were placed in the tracks of the assailant and found to correspond accurately, except in a few instances, where people had stepped near the assailant's tracks and had forced the mud into the latter, thus squeezing the sides together. The correspondence was particularly noticeable when the run-down left shoe was put into the assailant's track. The comparison was perfect.

The demeanor, conduct, and conversation of the plaintiff in error during the search for his father's body, then in the presence of the body after it was found, subsequently at the inquest, later at the time of his arrest, and lastly when he was under arrest, were all unnatural and eminently challenge attention.

F. C. Watkins testified that on the night of the homicide, when the people were searching for the body, plaintiff in error "didn't seem to have much to say, didn't seem that anything bothered him." He exhibited no anxiety. "He was laughing and talking with the boys." He smoked a cigarette that night. Carried a Winchester rifle all night. (This gun was borrowed from a

neighbor, at the request of plaintiff in error, when the search began.)   This witness asked him "if there were no tracks leaving the fence, and the defendant said, 'Yes, there were two tracks leaving the fence, but they don't go but a short piece before they come back.'"   To a suggestion that bloodhounds should be procured, the plaintiff in error replied they would do no good, because it had rained. Mr. Muse testified that the next morning the matter of procuring the bloodhounds was again suggested, and in reply plaintiff in error said "he had rather not have them, as they might get an innocent party."   That morning, when the body was discovered, the searching party was composed of the family of the deceased, Luther Taylor, W. A. Muse, John Powell, Luther Lancaster, and Mrs. Luther Lancaster.   All went over to the body, but the plaintiff in error lagged behind.   Mrs. Lancaster says: "He was right around there somewhere, but I could not tell you right where he was.   He was not with me and Mrs. Holder."   Luther Taylor says, as they got over the fence and went into the field, plaintiff in error "was following on behind, about fifteen or twenty feet," and that when they reached the body he was not with the family, but "was standing off behind," and that he was "smoking a cigarette"; that he was smoking when he came down to the bridge. This was evidently his first attitude, since it is said by Mrs. Lancaster later in her testimony that she saw him near the body.   Likewise Mr. Muse states that he saw him there, near the body.   The witness then testified:

"Q.   Tell the jury when he came up there what was his appearance, conduct, demeanor, and actions.   A.   I never saw him do anything.   He seemed to be uneasy. I believe he did smoke a cigarette.   Q.   Do you mean by a cigarette one of those bought cigarettes?   A.   No, sir; one that he made.   Q.   Did he make it there?   A. Yes, sir."

Plaintiff in error accompanied his mother to the house of a neighbor, after she had seen the body, and he then returned.   Of his demeanor and appearance at this time the witness Watkins says:   "Q.   Was he close to the body of his father?   A.   He came right up just behind the men that were standing there.   Q.   Was he in sight of the body?   A.   Yes, sir.   Q.   Tell the jury what his actions and demeanor were there.   A.   He walked up by the men.   He could see his father lying there in the field.   His eyes glanced around.   Q.   You say he looked at his father?   A.   Yes, sir; he looked at his father with as—well, I don't know how to express it, but he looked as though he was fierce and mad.   He looked at him like he might have been looking at something he was mad at.   Q.   What was the expression on his face?   A. That of being mad."

Another witness, Mr. McDade, says he saw plaintiff in error that morning out at the scene of the murder where the body was lying, and that he "was looking on as a casual observer."   Andrew Harrison, who came up after they had moved the body near to the road for the inquest, says he there saw the plaintiff in error standing

within thirty-five or forty feet of his father's body roll-
ing a cigarette.   The witness, T. J. Easterwood, says
that "he seemed to be standing around looking on as
other people were." Numerous witnesses testify that he
did not shed a tear or show any sign of grief. The plain-
tiff in error admitted in his testimony that he shed no
tears over his father's death, and said by way of expla-
nation or palliation: "I can't cry; I  haven't cried, I
reckon, in ten years." He was then questioned, and an-
swered as follows: "Q.   Did you or not feel acutely the
death of your father? A. Certainly, I was grieved over it.
Q. They have been talking about your smoking a cigar-
ette. Why did you smoke? A. I was smoking to quiet my
nerves.   I always smoke when I am bothered about any-
thing."   These were questions propounded by his own
counsel.   The witness Muse says that when the plain-
tiff in error saw his mother crying he went to her and
she stopped; that he saw this occur twice.   He slept in
the same room where the corpse of his father was laid
out Friday night, and slept soundly the night through.
When he was about to be placed under arrest on Satur-
day morning, December 29th, as the officer was proceed-
ing to read the warrant to him, he said: "Let me have
the damned thing.   I can read it."   The plaintiff in er-
ror admits this.   Another thing that happened at the
same time is thus stated by the witness G. R. McDade:
"I heard him ask a young man standing by him for a
match.   As to what he did, he stood there without bat-

ting an eye or moving a muscle, rolled a cigarette, and lit it." After he had been placed under arrest, and when he was on the way to jail, he said to the officer who had arrested him that if he had been armed, or had a pistol, when he was arrested, he would have "swapped it out" with him.

The murder was committed just at 6 o'clock on the evening of December 27, 1906. Mr. Lancaster, who lived nearest the scene of the tragedy, was sitting in his back yard stirring a kettle of lard which he was rendering. Mrs. Lancaster was at the supper table. She says: "We heard one, then in a little while two more shots, and the whistle blew"—the 6 o'clock whistle of a mill at Troy. Just after the first shot they heard some one shout: "Help! help! murder! murder!" Mr. Lancaster says: "Then I could hear a noise like this: 'Oh! oh! oh! o-o-o-o-oh!'" There was a greater interval between the second and third shots than between the first and second. The witness Sam Moffitt, who lived close to the roadside, says that before 6 o'clock he heard a buggy pass going towards Troy; next he heard going by in the same direction a horse in a lope, going, as he says, "tolerable fast"; then he heard a second buggy going in the same direction the horse had gone, westward towards Troy. He heard no other passing in that direction. After the man on horseback had passed, and after the second buggy had passed, he heard three shots in the direction of the bridge where the overturned buggy and entangled horse of the deceased were subsequent-

ly found.    The next thing he heard, a few minutes after the firing of the shots, was a horse loping back in the opposite direction; that is, eastward, in the direction in which the home of the deceased lay.    The horse was going faster than before.    The witness testified that the footstep of this loping horse sounded like those of Mr. Holder's big mare; that he was familiar with the sound of her hoof-beat when going in a lope across a bridge twenty-five or thirty yards from his house; that he had seen plaintiff in error ride by his house on this animal; and that he was accustomed to ride in a lope.    Mr. Lancaster also testifies to having heard a horse going back eastward shortly after the sound of the shots was heard, and he says the animal was going "pretty fast."    It was too dark at that time of the year, at 6 o'clock, for either of these witnesses to have identified the rider, nor do they claim to have looked.    Mr. Lancaster was rendering lard in his back yard, as already stated, and Sam Moffitt was in the kitchen seasoning sausage meat.    They merely heard the sounds as above related.

With these facts before us, and one or two others now to be stated, the story of the crime can be put together without error in any substantial detail.

There was to be a public installation of the officers of the Masonic lodge in Troy that night, and plaintiff in error knew that his father was going.    The matter had been discussed in the family.    Mr. Holder invited his wife to go with him, but she would not go and leave her little daughter Nona at home with the boys (so she

testified), and the road was so heavy that Mr. Holder would not consent to have both of them in the buggy. He then invited his son, the plaintiff in error, to go with him; but he declined on the ground that he wished to go to sleep that night. Knowing his father was going to Troy that night, he went into town late in the afternoon, at the time the witness Huey saw him, and purchased the box of cartridges. Shortly before, or about the time, his father left, he caught one of the horses and preceded him to the bridge, and there waylaid him in the darkness. The first shot was fired at the east end of the bridge, where the first shell was found. This one missed, but frightened the horse, so that he ran and turned the buggy over at the west end of the bridge, and threw Mr. Holder out. Here the second shot was fired, where the second shell was found, and was delivered at close range, as shown by the size of the hole and by the condition of the clothing of deceased. This was perhaps the shot that took effect in the side, as he probably could not have crossed the fence and run sixty feet after the shot in the breast near the heart. After the second shot, the deceased crossed the fence into the field and ran to save his life, pursued by the plaintiff in error, and the third shot was delivered at the point where he fell in the field. The plaintiff in error then clubbed him, first with the stock of the gun, and, after that was broken, then with the barrel, until it was bent into the shape in which it was found. He then dug into his victim's head with the muzzle of the gun, until the scalp

Holder v. State.

was scarred and the brain exposed in the manner above detailed. The cries of "Help! help! murder! murder!" were probably made at the bridge when the first shot was fired. The cries of "Oh! oh! oh! o-o-o-o-oh!" were probably made after the last shot was fired and when the clubbing began. After the plaintiff in error had completed this murder of his father, he hastened from the field, mounted the horse he had ridden to the scene, rode rapidly home, only a few hundred yards distant, turned the horse loose, and hid the gun under the barn, then went to the house, and acted as if nothing had happened.

The foregoing conclusions are only inferences from the facts contained in the record, and stated above; but they seem to us, in their substantial purport, necessary and inevitable inferences. The cartridges which the plaintiff in error purchased fit the gun of the deceased with scarcely more accuracy than did his shoes fit the tracks of the undoubted assailant of the deceased. Who but the plaintiff in error could have procured the gun of the deceased from his home and hid it under the barn after it had been used? Not his mother; not the young boy, Earl; not the two small children, Nona and Cecil. There was no one else to do it. There is no intimation in the record that any stranger had any opportunity to get hold of the gun. Why did the plaintiff in error grow angry when he saw the searchers for the gun close to the place where it was hid, and frighten them away with the terror-striking aspect of his visage, if he did

not know that the gun was hidden there? Why did he falsely seek to create the impression, when they were searching for his father's body, that his father owned no gun at the time, but had probably disposed of it by carrying it back to the seller, unless he was prompted by the knowledge of his own fatal connection with that gun and was gropingly warding off suspicion? Why did he change his shoes, but for fear that a comparison of them with the tracks made by the murderer would lead to the conclusion that he himself was the murderer? Why did he brush aside the suggestion for the procurement of bloodhounds, first on the ground that they could be of no service because it had rained, and next on the ground that they might track an innocent person, unless there was couched in his heart a fear that they might track him? Why did he seek to mislead the searchers for the body, on Thursday night, when asked if there were no tracks that led into the field, by saying that there were two tracks, but they went only a little way into the field, then came right out again? The reply showed that he knew the existence of the tracks and there was no evidence that the two tracks came out again. Why the false answer, unless there was a purpose to turn aside the course of a dangerous investigation? Was there ever a son, who loved his father, or who respected him even, or who had within his heart the sympathy for his kind belonging to our common humanity—was there ever such an one who sought for the body of his missing father in the spirit of levity manifested by the present plain-

tiff in error?   Did such a one ever so approach the body of that murdered parent as the plaintiff in error did, with halting and lagging steps?   Did such a one ever look upon the face of his father, broken in and mutilated, his head crushed and his body pierced by gaping wounds, without a tear, without any sign whatever of grief, but, on the contrary, with alternate indifference and malevolence?   What did the plaintiff in error's words mean when he was arrested?   "Hand me the damned thing.   I can read it."   Was it to show that he was not alarmed?   Do we hear one word of expostulation, any exclamation of surprise, any expression of horror, that he should be charged with so awful a crime as parricide, any natural outburst of human emotion?   None!   Only cold, impassive profanity, and sullen bravado.   And when he had been placed under arrest, and was on his way to jail, do we still hear any expression of grief, or regret, or claim of innocence?   None; only a boast that, if he had been armed, he would have resisted arrest.

In view of all these facts, can there be any doubt of the plaintiff in error's guilt?   We think there cannot be, and we are of the opinion that the jury were justified in finding that, although the evidence against the plaintiff in error was wholly circumstantial, no hypothesis could be entertained under it other than his guilt.

It is insisted that no motive is shown.   If the proof of guilt be clear, it is not necessary that there should be proven a motive, in the ordinary meaning of that term.

If one man kill another through the promptings of a wicked and depraved heart, it is not essential that the State should prove some grudge, or quarrel, or incitement of cupidity, or jealousy, or other special thing that proximately aroused the lethal purpose, although it be true that, when such things are proven, they add strength to the State's case when strength is needed, and tend to dissipate doubts when doubts have been engendered. But in the present case certain facts are proven which go far to explain the plaintiff in error's motive. At the age of fourteen the plaintiff in error gave evidence of an unruly and insubordinate disposition, and an impatience of parental control. At that age, without permission of his parents and without their knowledge, he left home and went to New Orleans. There he stayed three months and worked in a restaurant. He then returned home. Some time after he returned his father told him he either had to go to school "or get out away from him, one of the two." He then left home and went to the home of a neighbor, one Brack Stovall, and remained there a week. Afterwards, when he was sixteen years old, he again left home without his father's knowledge or consent, this time going to Los Angeles, Cal. Before he left he quit school, because, as he says in his testimony, he did not like the teacher. He says his father wished him to go to school. On this trip he remained away ten months. He says his purpose was to see the country; probably, also, to be with his brother Adolphus, who was there. From Los Angeles he went to Dallas,

Tex.; thence to Shreveport, La.; and from the latter city returned home. His mother testified that he has not left home on a trip since the time just mentioned, but that about a year before the murder his father whipped him with a pair of bridle reins because he took his (the father's) team and conveyed some boys to a baseball game at Union City. His mother testifies: "He has never been away from home since then." Plaintiff in error testified that the day before the murder, his father went to Union City to make arrangements for money to send him off to school, and that he was getting ready to go off to school. Several witnesses, persons not members of the family, and who visited the house only occasionally, testify that the relations between the father and son were pleasant. Plaintiff in error also says their relations were kindly; but this we do not credit. Mrs. Holder says that her husband was kind to the plaintiff in error; but, when he did anything his father did not wish him to do, "he would talk to him about it, and he never talked back or jawed back at him." The witness G. L. Williams, who worked on the farm a few months prior to the murder, says that Mr. Holder was a rough-speaking man; that he always spoke to him (Williams) roughly. He mentions an occurrence that took place out in the woods where plaintiff in error and his brother Adolphus were cutting wood. He states that he (Williams) went down to the place where the wood was being cut, and plaintiff in error was leaning on his ax, or had his ax in his hand, and that as he (Wil-

Holder v. State.

liams) came up, plaintiff in error said, referring to his father, he had just been "raring on Dolphus." From all this we infer the case of a restive, unruly boy and a stern father, who tried to do his duty by his son, but who corrected the son's derelictions with harsh speech and harsher corporal punishment.

We can well believe that under such circumstances there was not much tender love between the parent and child—on the one hand a severe, exacting father; on the other, a restless, insubordinate, and rebellious son, always inwardly chafing against the restraints imposed on him. It was perfectly natural, too, that the wild disposition which led him to abandon his father's home at the early age of fourteen and of sixteen, and the consequent reliance during these absences upon his own will and wishes, and the opportunity of giving rein to his own unchecked impulses and passions, would add to his impatience of authority and intensify the spirit of lawlessness within him. We can easily conceive how such a boy would resent, when seventeen years old, a castigation with a pair of bridle reins, and that the memory of it would rankle in his heart. We have seen that his father had trouble with him on the subject of going to school, so much so that he had presented to the son, a year or two before, the alternative of going to school or of being driven from home. We have seen that on the very day before his death, the father had made arrangements to send this boy off to school. We know, from this boy's conduct when the people were hunting for the

body of his father; and from his conduct after the body was found, and at the time of his arrest, and after his arrest, that he had grown hard, unfeeling; and fierce.    It is not difficult to believe that the thought of parricide would arise in the perverted mind of such a youth, and that the small additional preparation for sending him off to school would furnish the momentum that would hurry the deadly thought into a deadly purpose, with the view of at once obtaining freedom from restraint and at the same time of avenging what we may well think appeared to his mind as the past tyrannies of his father.

So far we have considered the case without bringing forward the defense interposed in the evidence.    That defense, in addition to plaintiff in error's personal denial of guilt, is an alibi.    His mother, his brother Earl, and he himself all swear that at the time the murder was committed the plaintiff in error was sitting in his mother's room at their home.    There are some variations in their testimony, but this is the substance of what each of them says.    On this subject the plaintiff in error says that when his father left, starting to Troy, he "was in the hall, or out on the back porch at the water bucket."    He says that after his father left "I came back in the house and sat down about five minutes, got up and walked in the yard about two minutes and a half or three minutes, then came back and sat down.    I came back in the house, and my mother and brother Earl, and sister, and my small brother, Cecil, were in mother's

room popping corn. When I went out of the house they had just put the popper on the stove, and when I came back they had just taken it off. I sat down and talked to mother until about half past 7 or 8. Then I went to bed." Further on in his testimony he says it was the children, Earl and Nona, that were engaged in popping corn. On cross-examination he testified that after his father left he went into the family room and sat there five or ten minutes; sat there smoking. The children were there, and his mother was in the dining room finishing the dishes after supper, putting them away. The children were popping corn. He then stepped out in the back yard, and remained about $2\frac{1}{2}$ or 3 minutes. Earl had the popper on when he went out, and was just taking it off when he went back. The corn was burning or smoking, and he told Earl about it. His mother was in the room when he went back. She had finished the dishes. She was standing by a table looking at a paper. He sat there something like an hour and a half before any of those present (his mother, Earl, Nona, and Cecil) retired. He retired about 8 o'clock. At 6 o'clock he was sitting by the washstand in his mother's room. He heard the 6 o'clock whistle blow and looked at his watch.

Mrs. Holder says that when her husband left she was standing just inside the door of her room, and that Lee was in the room sitting by the side of the washstand; that as soon as her husband left she returned to the dining room, leaving Lee still sitting by the washstand;

that what she had yet to do in the dining room before completing her work there was, to use her own words, as follows: "I had to pour the water out of my dishpan and pour a little more in it, and wash out my dishrag. Then I poured the water out and wiped out my dishpan, took the milk bucket and the milk cup, and hung them up. Then I walked across the room and fixed my churn, put a plate over that, then walked back across the room and got a straight chair and put it against the door, under the door knob, and went on in the other room. Just as I walked to the table Lee entered the room from the hall and sat down. He told Earl his corn was burning. I looked up an said: 'Yes; your corn is burning.' Q. When Lee came in, did you have hold of a paper? A. No, sir; I had, just picked up the comb. I picked up the comb first and started to comb Cecil's hair, and when Lee spoke about the corn burning I looked up and said, 'Yes, Earl; you are burning your corn,' and Cecil turned away from us and went to see about the corn, and Earl was opening the popper, and I told them they would burn their hands, and then I picked up a paper and went to reading." She further testified that from the time she stepped out of the room, leaving Lee there, to go to the dining room and perform the work remaining there to be done, until the time she returned to her room, not more than four or five minutes elapsed, and that immediately after she entered the room Lee entered it, and did not leave it until 8 o'clock, when he went to bed. Asked if she heard the

firing of a gun, or guns, that night, she answered: "I heard some firecrackers, as I thought; those large fire-crackers. Q. About what time did you hear them? How long after you came into the room? A. Earl had just taken his corn out and was eating that; that was the first popper of corn. Just as Cecil turned away from me when I had started to comb his hair, I heard something go bang, bang, bang, two or three times, and I thought it was the negroes shooting firecrackers. Q. State whether either one of the children went to the window and looked out. A. Cecil did. I told him to go there and maybe he could see some Roman candles go out, and I told him to put his hands up to his face at the window and he could see; but just then Earl said they were firecrackers, and Lee said: 'Of course, they are firecrackers.' I said: 'Of course, they are fire-crackers shooting; but they nearly always shoot Roman candles, too, when they are shooting firecrackers.' And while we were talking Cecil went to the window and looked, and said: 'Mammy, I don't see any.' And he jumped back to the corn." On cross-examination Mrs. Holder said that her husband called her from the dining room to help him on with his overcoat, and that as she entered her room in answer to this call, Lee followed her into the room, and that as soon as she had helped her husband on with the overcoat he went to the buggy; that after he left she returned to the dining room, and after she had finished her work there she went back to her room; that, as she entered it, Lee also entered; that she

started to comb Cecil's hair, as before related, then the matter of the burning popcorn arose and was disposed of, and she sat down to read, and "read from then until 8, off and on"; that Lee was smoking his pipe part of the time; that she looked up once and saw him filling his pipe; that she does not know what else he was doing, except smoking, until he went to bed.

The boy, Earl Holder, fifteen years old, when he testified, said that as his father started off he (the witness) walked back into the kitchen (also used as a dining room) and picked up the popcorn popper and got some corn, and went right back into his mother's room, and while he was getting the corn Lee stepped out; that he had shelled about half an ear of popcorn when Lee came in, and was popping the corn. From other parts of his testimony it is clear the witness means that Lee was in his mother's room when witness started to the kitchen to get the popcorn and the popper, and that as witness left the room to go to the kitchen, or while he was in the kitchen, Lee also left his mother's room and went out into the hall, but came back as soon as the witness had shelled half an ear of popcorn, and while he was popping it; that he had just begun to pop the corn when Lee returned; that Lee did not leave the room again that night until he went to bed; that they were all talking together and eating popcorn during the evening until bedtime—does not remember what his mother was doing, does not remember whether she was reading; that while they were eating the first popper of corn he heard

three firecrackers; that Lee was there in the room; that Lee came in when witness was popping the first popper of corn, and his mother also came in then; that Lee came in and sat down, and told him that his corn was burning.

When these three accounts of the matter are compared with some attention to their details, they are seen to differ materially. According to Lee's (plaintiff in error's) testimony, he was standing in the hall, or on the back porch at the water bucket, when his father started to Troy. According to his mother and Earl, he was in his mother's room. According to plaintiff in error's testimony, after his father left he went into his mother's room and sat there five or ten minutes, then went out and remained $2\frac{1}{2}$ minutes; that when he entered the room the children were popping corn, and when he returned, the corn they had put on the stove was burning, and he called their attention to it. According to Earl, the plaintiff in error entered the room when they had just put on the first popper of corn, and did not go out any more, but remained in the room until bedtime. According to the plaintiff in error, when he first entered the room his mother was there with the children. According to her testimony he entered the room just after she did. According to plaintiff in error and his mother, he left the room after the first popper of corn had been put on, and returned before it was taken off, in time to inform Earl that the corn was burning. According to Earl the plaintiff in error came in after the first popper of corn

Holder v. State.

had been put on and did not leave the room after that time. According to plaintiff in error, he talked to his mother from the time his father left until about half past 7 or 8 o'clock, his bedtime. According to his mother, she read during that time. She says nothing about talking to Lee; that she did not see him do anything but smoke; that she looked up once, and saw him filling his pipe. Earl says he does not know what his mother was doing, does not know whether she was reading or not; that they spent the time talking and eating corn from supper time to bedtime.

In view of these contradictions and incongruities between the several accounts of the alibi, it is impossible to place reliance in the testimony of either of the witnesses. Moreover, we do not believe that any one would mistake the sound of a shotgun, threefourths of a mile away, for the popping of firecrackers. In addition to all of this, the plaintiff in error told the witness Muse that he was absent from the house ten or fifteen minutes. The story of the alibi is inherently inconsistent and incredible. But, aside from this, it cannot stand against overwhelming testimony of plaintiff in error's guilt furnished by the other evidence in the case which we have already set out and considered.

We shall now consider the assignments made upon questions of evidence.

It is insisted that error was committed in the admission of the testimony of Sam Moffitt concerning his

119 Tenn.—14

recognition of the horse ridden by his house in the early evening of December 27th, just before and just after the murder, as one of Mr. Holder's horses, by the familiar sound of its hoof-beat upon the bridge near his home. The objection is to the recognition of the horse merely by the sound of its feet, without sight of the animal. The ground stated in the objection was that it was not competent for the witness to give his opinion upon such a subject.    There is no force in this objection.    The witness testified that he was familiar with the sound of the horse's feet when going in a lope, from having often seen and heard the animal lope.    It was competent for him to testify to the fact, and to give his opinion as to the identity of the footsteps he heard with those of the Holder horse.    One may become acquainted with the gait of a horse, just as he can with the walk of a human being, or the sound of a man's voice.    Nonexpert witnesses may give their opinion upon a variety of questions, among others the identity of things.    See *Railroad* v. *Hunton,* 114 Tenn., 609, and especially page 630, 88 S. W., 182, 188 referring to and approving and quoting from volume 1, section 676, of Elliott on Evidence.

The next point relates to an item of evidence not previously referred to in this opinion.

In October, 1906, all of the family of Rev. B. L. Holder, except plaintiff in error, fell suddenly ill, including one G. L. Williams, a hired farmhand.    The illness supervened immediately after eating supper, and was manifested by violent vomiting, which lasted, with some in-

termissions, for several days.   Some of the family were affected more violently than others; but it was five days before they had all recovered.   Dr. Hevener, who was sent for, first thought it was due to milk sickness; but upon examination of the calves, which he supposed had had access to the cows, and on finding them unaffected, he dismissed this theory.   His next hypothesis was ptomaine poisoning; but this was likewise dismissed. His final conclusion was that the illness was due to arsenical poisoning.   There were two symptoms, however, of such poisoning which he does not testify were present —the burning sensation in the stomach and purging. The former he says nothing of, and the latter he refers to, but says he gave medicine to produce purging, and therefore cannot say whether there would have been such result without the medicine.   Dr. Nailing testified that the burning sensation does not always follow. There were other symptoms mentioned by him—cold, clammy skin and sunken eyes—that were not referred to in the testimony of Dr. Hevener.   Dr. Nailing also speaks of colicky pains, and spasms in the calf of the leg.   These symptoms were not referred to by Dr. Hevener, the attending physician, in his evidence.   Dr. Nailing further testified that a patient suffering from acute arsenical poisoning would not be able to get up under two weeks' time, because it affects the nerves, and there is more or less paralysis of the legs.   Mrs. Holder testified that she arose and cooked breakfast the next morning, and that the family ate breakfast, but that they

continued ill for several days. Dr. Nailing testified that ptomaine poison would produce vomiting, also cramping and purging. Davie Bright testified that about two weeks before the sickness of the Holder family he sold to plaintiff in error a box of Rough on Rats. Plaintiff in error testifies that after his father recovered he learned that he was charged with purchasing this substance from Davie Bright, and that he went to see the latter, and cursed him, and denied that he had made the purchase, and he denied upon the witness stand that he had bought the substance. Davie Bright, however, is shown to be a young man of unimpeachable character, and he says the purchase was made. The plaintiff in error, besides his personal interest in the issue, and the facts, already referred to, which go to his credit, also admits that he forged his father's name to a check. We have no doubt that he bought the Rough on Rats.

G. L. Williams testifies that during the day, on the night of which the illness of the family occurred, plaintiff in error and he were gathering corn; that plaintiff in error was laughing and talking while the work was going on; that during the afternoon they went to the well at the house to get water; that plaintiff in error went into the house and remained ten or fifteen minutes, all of the family being absent from the house; that plaintiff in error said he was going into the house to change his socks; that after they quit gathering corn that day plaintiff in error said he was sick and was not going to eat any supper; that he had not been complain-

ing of being sick during the afternoon; that plaintiff in error went in to the supper table and sat down; that he took a biscuit and cut off one corner; that witness then said, "I thought you were not going to eat any supper," and plaintiff in error then "just shoved his plate back" and ate only one or two bites; that witness ate supper, as did all the rest of the family except plaintiff in error, and all, except plaintiff in error, became sick; that witness felt "curious" before he got up from the table; that he smoked, and still felt "curious"; that plaintiff in error was lying on the bed, laughing at him; that he began vomiting, and continued vomiting until 11 o'clock; that plaintiff in error laughed at him when he was vomiting; that all of the sick ones were affected as he was, vomiting; that witness went to his brother's house, two hundred yards away, and sent for some medicine to check his vomiting, and after taking two doses he grew quiet and slept; that before witness left Mr. Holder gave plaintiff in error some calomel. Mrs. Holder testified that plaintiff in error was not well, but was suffering with fever, and that he took some calomel that night, under direction of his father, as a preparation for more specific medication for chills and fever, which she says he was suffering from. Plaintiff in error explains the circumstance of going into the house, or telling Williams at the time that he was going, to change his socks, by saying that his feet had a tendency to sweat and scald, and that he was compelled to change his socks frequently, and his mother in her

testimony sustains him in this.    Plaintiff in error denies, in his testimony, that he placed poison in the food of the family.    There was no analysis of the contents of the stomach thrown up by any of the persons who were ill.    A box of Rough on Rats, the ordinary commercial package, was exhibited in evidence, which Davie Bright testified was similar to the one he sold plaintiff in error.    No analysis was made of the contents of the box produced which had been sold to plaintiff in error.    The testimony of Davie Bright, a drug clerk, and of Dr. Hevener and Dr. Nailing, was that Rough on Rats was a poison—Dr. Nailing that the commercial substance known as "Rough on Rats" was composed of arsenic and charcoal; Dr. Hevener, that it was forty or fifty per cent arsenic.    Mrs. Holder testified that the family continued to use the foodstuffs they had on hand the next morning, except the milk; that they did not use the milk.

The objection stated in the assignment of error is that the testimony was incompetent, because it tends to show the commission of a distinct, independent crime; also that there is nothing to show that plaintiff in error put any substance in the food partaken of by the family, hence that the testimony recited bore no relevancy to the issue.

These objections were substantially made on the trial to the testimony of Dr. Hevener, but not to the testimony of the other witnesses.

The other witnesses, except G. L. Williams, were introduced by plaintiff in error.

As to the first point: So far as concerns the general question, we are of the opinion that previous attempts on the life of a person by the accused may be shown for the purpose of exhibiting the animus or state of mind of the accused towards the deceased, as indicating hostility, or a settled purpose to harm or injure that person. *Williams* v. *State,* 8 Humph., 585, 593, *et seq.*

In Hughes on Criminal Law and Procedure it is said: "Evidence of previous unsuccessful attempts to commit the same crime for which the accused is on trial is admissible." Id., sec. 3134. To the same effect, see section 3137. In section 3138 it is said: "It is not a valid objection to evidence, otherwise competent, that it tends to prove the prisoner guilty of a distinct and different offense. Evidence of other offenses is admissible to prove intent, motive, knowledge, malice, and the like." In section 3140 it is said: "On a charge of attempting to poison a person by putting poison in his cup, it is proper to show in the evidence that a few days before, on a different occasion, a similar substance was found in his cup and saucer, and that drinking from the cup made him sick. Other facts than those alleged in the indictment may be shown in the evidence for the purpose of showing a system or plan of the party concerned in the transaction alleged in the indictment." In section 149 it is said: "Where the prisoner was charged with the murder of her child by poison, and

the defense was that its death resulted from an accidental taking of such poison, evidence that two other children of hers and a lodger in her house had died previous to the present charge under like circumstances by poison was held to be admissible." In Wharton on Homicide it is said: "Previous attempts to kill the person afterwards killed warrant an inference of express malice or deliberation and premeditation in killing, as a presumption which will sustain a conviction of murder in the first degree." Id. (3 Ed.), p. 235, sec. 155. In the same work it is said: "Prior attempts by the accused to kill the deceased may be given in evidence, and so may evidence of a prior aggravated assault. And lapse of time between the previous quarrel or difficulty and the homicide goes only to the weight of the evidence. It does not affect its admissibility." Id., p. 925, sec. 599. There can be no question, then, of the competency of evidence of previous assaults upon, or attempts to kill, the deceased by the prisoner.

As to the second point, the relevancy of the evidence, we think this equally clear. The weight of the evidence was for the jury; but we think there can be no doubt that the facts recited, either when taken all together or when we consider alone those brought out by the witnesses for the State, have a tendency to show that the plaintiff in error attempted to poison the whole family there at home (Dolphus was absent), including his father. Whether the inference afforded be very slight,

or what degree of strength the facts show, we need not determine. It is sufficient to say that the testimony had some relevancy, and was therefore competent.

The next question arises upon the following occurrences shown in the bill of exceptions: As before stated, Mrs. Holder, the mother of plaintiff in error, was introduced in his behalf, and gave evidence tending to support an alibi for him; that is, to the effect that plaintiff in error was in her family room at home, in her presence, before 6 o'clock, at 6 o'clock, and thereafter until 8 o'clock, on the night of December 27, 1906, and hence could not have killed his father in a field near the road, three-fourths of a mile away, at 6 o'clock.

On cross-examination, Mrs. Holder was asked the following question: "At your house, on Saturday afternoon, after your husband had been killed, in the presence of those parties you have stated were there, state whether or not you said this: 'Is it possible that I have raised a boy that would kill his father?' And your daughter Nona said, in substance: 'Maybe Lee didn't kill him.' And you replied: 'Yes; I will have to admit that he did it.' " She answered: "I didn't say anything like it."

When the question was put, the attorney for the plaintiff in error objected on the ground that it was incompetent, because it called for the mere opinion of the witness; that is, because the witness was asked to state whether she had expressed the opinion referred to. The objection, however, was overruled, and the wit-

ness was directed to answer, and made answer as just set out.

Afterward Mrs. Hevener, one of the persons referred to in the question as being present, was placed upon the stand in rebuttal. After identifying time and place, Mrs. Hevener was asked questions and answered as follows:

"Q. I would ask you to state, Mrs. Hevener, while you were there, you heard this statement made by Mrs. Holder, or this in substance"—repeating question propounded to Mrs. Holder; and this was followed by a repetition of the objection above quoted. The witness answered that Mrs. Holder did make the statement referred to, in substance.

Subsequently in the course of her examination the circumstances under which the statement was made were thus detailed by Mrs. Hevener, and the actual words used according to the witness' recollection:

"I walked up to her bedside. I did not speak, for I feared to speak to her, for I did not know how she was. She opened her eyes and saw me"—witness was a sister of the deceased—"and began screaming, and said, 'Oh, how can we stand it?' And I said: 'It is awful bad; but we have to stand it.' I turned. I couldn't stay there, and I started to walk out, and stopped at the foot of her bed, and she said: 'Is it possible that I have raised a child that would kill his poor papa?' And Nona began to console her, and said: 'Mama, don't you worry and kill yourself, for what

would we do without you, and maybe Lee didn't do it.' She said: 'Yes, he did, Nona; yes, he did.' "

It is insisted by the State that the evidence was competent for the purpose of impeaching the witness Mrs. Holder; secondly, that, if incompetent, no injury was done the plaintiff in error, inasmuch as this evidence was withdrawn from the jury.

The charge is not a part of the bill of exceptions, hence cannot be looked to; but the attorney-general refers to the fourteenth paragraph of the motion for a new trial as containing an admission that the evidence was withdrawn.   That paragraph reads as follows: "The court permitted the attorney-general to ask Mrs. J. B. Hevener certain questions tending to impeach Mrs. B. L. Holder, which questions were objected to by defendant, and said questions were not withdrawn from the jury until the charge of the court; and it is attempted to withdraw said illegal and irrelevant testimony.   It is submitted that said illegal and incompetent testimony was calculated to prejudice and may have prejudiced the interests of the defendant, and should never have been permitted to go before the jury, and the court was in error in so doing."

As to the question of competency:   The rules applicable to the subject are thus laid down in Wigmore on Evidence (volume 2):   *"What amounts to a self-contradiction.*   In the present mode of impeachment there must, of course, be a real inconsistency between the two assertions of the witness.   The purpose is to in-

duce the tribunal to discard the one statement because the witness had also made another statement which cannot at the same time be true. Thus, it is not a mere difference of statement that suffices; nor yet is an absolute oppositeness essential; it is an inconsistency that is required. Such is the possible variety of statement that it is often difficult to determine whether this inconsistency exists. But it must appear *prima facie* before the impeaching declaration can be introduced. As a general principle, it is to be understood that this inconsistency is to be determined, not by individual words and phrases alone, but by the whole impression or effect of what has been said or done. On a comparison of the two utterances, are they in effect inconsistent? Do the two expressions appear to have been produced by inconsistent beliefs?" Id., sec. 1040.

The author continues in the next section: "*Opinion as Inconsistent.* A common difficulty is to determine whether some broad assertion, offered in contradiction, really assumes or implies anything specifically inconsistent with the primary assertion. The usual case of this kind is that of a general statement upon the merits of the controversy, which is now offered against a witness who has testified to a specific matter. Thus, A testifies for the prosecution that he saw the defendant near the scene of the alleged arson; it is offered to show that he has elsewhere declared that he is sure the defendant is innocent; is this admissible? The usual answer of some courts is that the declaration

should be excluded, because it is a mere opinion. This is unsound (1) because the declaration is not offered as testimony, and therefore the opinion rule has no application; and (2) because the declaration in its opinion aspect is not concerned, and is of importance only so far as it contains, by implication some contradictory assertion of fact. In short, the only proper inquiry can be: Is there, within the broad statement of opinion on the general question, some implied assertion of fact inconsistent with the other assertion made on the stand? If there is, it ought to be received, whether or not it is clothed in or associated with an expression of opinion." Id., sec. 1041.

Necessarily there will be much room for difference of opinion in applying the rule to concrete cases as they arise. We think, however, it is clearly applicable to the case before us. Mrs. Holder went to the place where her husband was murdered, and saw him as he lay there dead, about three-fourths of a mile from home, in a field on the roadside. If her son was in her presence all the time, with the exception of four or five minutes, after his father left, until he went to bed at 8 o'clock, she knew that he could not have committed the murder. Her statement, therefore, to Mrs. Hevener, or in Mrs. Hevener's presence, that she must admit her son was guilty, or that she believed him guilty, while in form the statement of an opinion, necessarily implied a contradiction in fact of her subsequent statement on the witness stand that her son was

in her presence at the time of the murder; that is, necessarily implied the statement that her son was not in her presence at the time she said he was. If he had really been with her all the time she says he was, a belief of his guilt could not have entered her mind.

We are referred to our own case of *Saunders* v. *City & Suburban Railroad Co.*, 99 Tenn., 130, 41 S. W., 1031, as being in conflict with the rule laid down by Wigmore. In that case it appeared that Dr. Saunders had been injured while crossing a street railroad track in his buggy, for which injury he sued the company. His daughter was with him at the time the accident occurred. On the trial she gave testimony which tended to show that the servants of the street railway company were negligent, and that by this means the injury was inflicted upon her father. For the purpose of contradicting her, she was asked on cross-examination if she did not state at the time, in the presence of certain persons, that the accident was due to her father's fault. She denied that she made any such statement. The railroad company introduced witnesses in rebuttal who testified that she did make that statement in their presence at the time and place fixed in the impeaching question. When the case reached this court on appeal, it was held error to permit the asking of the impeaching questions and the introduction of the subsequent impeaching evidence. It is true that the reason given in the opinion of the court was that the statement made by Miss Saunders was the mere expression of an opinion on her

part, which would not have been admissible as original evidence, and could not, therefore, be admissible in contradiction; and numerous cases so hold, as shown by the citations contained in that opinion, and the same rule may be found laid down in certain subsequent Texas cases, viz.: *Scott* v. *State* (Tex. Cr. App.), 93 S. W., 112; *Watson* v. *State* (Tex. Cr. App.), 95 S. W., 115, 116; *Barbee* v. *State* (Tex. Cr. App.), 97 S. W., 1058. But we think a truer expression of the underlying reason, or the governing principle, is contained in the excerpts which we have made from Wigmore; and the case of *Saunders* v. *City & Suburban Railroad Company* was well decided within that principle. The liability of the railroad company depended upon mixed questions of fact and law, that could be determined only by the court and jury, while the opinion of Miss Saunders, if competent, could be of value only as placing her in the position of the tribunal. Her opinion that her father was to blame involved the proposition that her father's negligence was the proximate cause of the accident, and necessarily involved a survey of all of the attending facts, and a conclusion or inference therefrom. There was in her expression of opinion no implied statement of fact inconsistent with the testimony which she had given. Of course, the opinion of witnesses, except in the well-defined class of cases where opinion evidence is admissible, cannot be used for or against one or the other of the litigants, either as direct evidence, or by way of impeachment; but this observa-

tion does not apply where the expression in the form of an opinion implies the statement of a fact clearly in conflict with the statement of the witness on the stand whose testimony is sought to be impeached thereby.

Some illustrations from the cases in other jurisdictions may be found useful.

In *State* v. *Kingsbury*, 58 Me., 238, the prisoner was convicted of inciting, hiring, etc., one James Kitchen to burn a house. The prisoner's wife (a competent witness in that State) testified that she was present during the conversation between defendant and Kitchen, and that nothing was said or done by the defendant to induce Kitchen to burn the house, and that defendant did not furnish Kitchen a certain kerosene lamp filler with which it was sought to prove the house was fired. The State offered proof, which was admitted, that witness had said to Sawyer, about a half hour after her husband's arrest, on being told by Sawyer that Kitchen had confessed that defendant had hired him to burn the house, viz.: "Well, he would never have done it if it had not been for others. . . . Others are more to blame than he was." This was held competent. The court said: "Whenever a witness has testified to any material facts, any acts or declarations of his which appear to be inconsistent with such testimony are competent by way of contradiction. It is not necessary that the contradiction should be in terms. Statements by the witness, inconsistent with his testimony on material matters, may be proved

against him." In *Comw.* v. *Wood,* 111 Mass., 411, a conviction for overdriving a horse, defendant's mother testified that she saw him driving the horse, and that he did not overdrive it. The State proved, after laying proper grounds, that she had said to a witness that defendant was guilty. This was held competent. · In *Mayer* v. *People,* 80 N. Y., 377, it appeared that there was a conviction for obtaining goods by false pretenses. Ferdinand Mayer, an uncle of the prisoner, had testified for him; his testimony strongly "tending to sustain defendant's denial that he had made the representations charged." The State was permitted to prove, as tending to impeach his testimony, that the witness had said that defendant "had done a great wrong" in the matter, and that defendant and his partner had "acted as thieves." In the case of *State* v. *Baldwin,* 36 Kan., 14, 12 Pac., 318, there was a conviction of William Baldwin for the murder of his sister. The case was made out by circumstantial evidence; the theory of the defense being that the deceased suicided. In its opinion the court said: "The objections urged to the questions asked the clergyman, Mulford, on cross-examination, are not good. After stating, in his examination in chief, what the conduct and appearance of the defendant was soon after the death of his sister, with a view of showing the conscious innocence of defendant, it was proper to inquire if the witness had not stated, before the coroner's jury, that defendant impressed him

119 Tenn.—15

at once of being guilty of the murder. It was allow-
able on cross-examination, and, besides, if denied, it
afforded a foundation for impeaching the witness. He
gave a qualified answer, saying that he would not deny
or affirm that he had so stated, but did deny stating
that he had a thorough impression of his guilt, and he
added that the appearance of the defendant was that
of a painful surprise that any one should suspect him
of the offense. We cannot agree that the rule was er-
roneous." In the case of *Franklin* v. *Commonwealth,*
105 Ky., 237, 48 S. W., 986, Noah Franklin was con-
victed of murdering Daisy Sullivan, and sentenced to
life imprisonment. The deceased was a young woman
about seventeen years of age and about to become a
mother. There was evidence tending to show that the
prisoner was the author of her ruin. The evidence re-
lied upon by the State was wholly circumstantial. Ed.
Howard, a witness for the State, testified on the trial
that over a month before deceased was killed, defendant
told him he was going to kill her, and that some con-
versation followed this statement as to the manner and
method by which she should be killed. After stating
this testimony, the court said in its opinion: "It ap-
peared in evidence that appellant was discharged on
the examining trial, and the witness Ed. Howard was
asked, on cross-examination, if he did not say to W. J.
Cox and two others, after this trial, at a time and
place specified, that appellant had come clear, and that
he knew he had nothing to do with the killing of Daisy

Sullivan.  He denied making this statement, and the court refused to allow him to be contradicted on this point by the other witnesses.  Without his testimony, I do not think appellant could possibly have been convicted, and it seems to us that his statement, at the time, that he knew appellant had not killed Daisy Sullivan, was so different from his testimony given on the trial that the court should have admitted proof of his having made those statements for the purpose of impeaching his testimony." In *Schell* v. *Plumb et al.*, 55 N. Y., 599, plaintiff sued for an alleged breach of contract made with defendant's testator to support plaintiff during her life.  Jacob Harris, a witness for defendant, said that he was present during conversations between plaintiff and defendant's testator in which plaintiff admitted that she had no such contract.  On cross-examination he was asked if, since the death of testator, he had not, in speaking with reference to the alleged contract, said that "the old lady ought to have $1,000 out of the estate." He denied this, and plaintiff was permitted, over objection, to prove that he had so stated.  This was held not error.

The whole court being of the opinion that the testimony objected to was competent, we need not go into the question whether the recital in the motion for new trial upon the subject of the withdrawal of the evidence, nothing else appearing in the record upon the subject, is sufficient evidence of the fact that there was a withdrawal in proper form, a subject upon which there is

Holder v. State.

a difference of opinion among the members of the court.

Errors are assigned upon the charge of the court; but, as that instrument was not made a part of the bill of exceptions, they cannot be considered. There was also an error assigned upon the refusal of the court to entertain an affidavit for a continuance, but this affidavit failed, also, of incorporation into the bill of exceptions, and the point cannot be considered.

After full consideration, as above, of the points presented for reversal, we are of opinion there was no error in the judgment of the court below, and it must be affirmed.