### IN THE

# SUPREME COURT OF TENNESSEE

### FOR THE

## EASTERN DIVISION.

## KNOXVILLE, SEPTEMBER TERM, 1921.

MAURICE MAYS *v.* THE STATE.*

*(Knoxville.* September Term, 1921.)

1. **CRIMINAL LAW.** After conviction approved judgment will not be reversed upon facts unless evidence preponderates against guilt.

   After one accused of murder has been convicted by a jury and the verdict has been approved by the trial judge in order to abtain a reversal upon the facts, accused must show that the evidence preponderates against his guilt and in favor of his innocence. (*Post, p.* 136.)

   Case cited and approved: Cooper v. State, 123 Tenn., 37.

2. **HOMICIDE.** Conviction of murder sustained.

   In a prosecution for murder, accused's defense being an alibi, *held,* that the evidence did not so preponderate against his guilt and in favor of his innocence as to require a reversal. (*Post, p.* 137.)

---

*On the question of evidence of other crimes in criminal case, see note in 62 L. R. A., 193.

On evidence as to when other crime is part of *res gestae*, see note in 62 L. R. A., 308.

Mays v. State.

3. WITNESSES. Cross-examination as to whether police officers refused to resist mob held properly excluded in murder prosecution.

In a prosecution of a negro for the murder of a woman, it was not error to refuse to permit a chief of police captain to testify on cross-examination as to whether they refused to take any stand against a mob or to make any effort to quell it. (*Post, pp.* 137-139.)

4. HOMICIDE. Statements of eyewitness in identifying defendant held admissible.

In a prosecution of a negro for murdering a woman, evidence that an eyewitness, after identifying accused, and after he had denied his guilt, stated to him, "If I had a pistol, I would or could kill you," *held* admissible as part of the identification. (*Post, p.* 139.)

5. CRIMINAL LAW. Statements by police desk sergeant to police officer as to description of murerer held inadmissible.

In a prosecution of a negro for murdering a woman, it was not error to refuse to allow a police officer to testify that the police desk sergeant stated to him that a woman had been killed, and that the man who killed her was a low black man and wore overalls. (*Post, p.* 139.)

6. CRIMINAL LAW. Evidence as to assaults on other persons properly excluded.

In a prosecution of a negro for murdering a woman, evidence that subsequent to the murder the homes of a number of women had been entered by some person and either assaults or attempted assaults made upon females *held* properly excluded. (*Post, pp.* 139, 140.)

7. CRIMINAL LAW. Evidence that accused had committed other similar crimes generally inadmissible.

In a prosecution for a particular crime, evidence which in any manner tends to show that accused has committed another crime wholly independent of that for which he is on trial, even though it is a crime of the same character, is irrelevant and inadmissible. (*Post, pp.* 140, 141.)

8. CRIMINAL LAW. Evidence of other crimes admissible where tending to prove guilt of crime charged.

Mays v. State.

The rule that evidence of commission of other similar crimes by accused is inadmissible does not apply where the evidence of another and distinct crime tends directly to prove defendant's guilt of the crime charged. (*Post, pp.* 140, 141.)

9. CRIMINAL LAW. Evidence of another crime admissible if part of res gestæ.

Evidence of another and distinct crime is admissible if it was committed as part of the same transaction and forms part of the *res* gestæ. (*Post, pp.* 140, 141.)

10. CRIMINAL LAW. Evidence identifying accused not inadmissible because tending to prove commission of another crime.

Where the commission of a crime is proven, evidence to identify accused as the person who committed it is not to be excluded solely because it proves or tends to prove that he was guilty of another and independent crime. (*Post, p.* 141.)

11. CRIMINAL LAW. Attempts to commit similar crimes admissible where guilty knowledge must be proven.

When the nature of the crime is such that guilty knowledge must be proven, evidence is admissible that at another time and place not too remote the accused committed or attempted to commit a crime similar to that charged. (*Post, p.* 141.)

12. CRIMINAL LAW. ' Evidence of other similar crimes admissible when showing particular necessary criminal intent.

Evidence of other crimes committed by accused similar to that charged is relevant and admissible when tending to show a particular criminal intent which is necessary to constitute the crime charged. (*Post, p.* 141.)

13. CRIMINAL LAW. Evidence of motive admissible although showing another similar crime.

Evdence showing motive is admissible notwithstanding it also shows the commission by the accused of another crime of similar character. (*Post, p.* 141.)

14. CRIMINAL LAW. Evidence of another offense admissible to show system of criminal action.

Mays v. State.

It is admissible, where the crime charged is a part of a plan or system of criminal action, to offer evidence of other crimes near to it in time and of similar character to show the knowledge and intent of accused, and that the crime charged was not the result of accident or inadvertence. (*Post, p.* 142.)

Cases cited and approved: Parrish v. State, 129 Tenn., 274; Gardner v. State, 121 Tenn., 709; Holder v. State, 119 Tenn., 210; Peek v. State, 21 Tenn., 78; People v. Molineux, 168 N. Y., 264; Hensley v. State, 28 Tenn., 243; Sible v. State, 50 Tenn., 139.

15. **HOMICIDE.** Rule admitting evidence that another committed offense charged held inapplicable.

In a prosecution for murder, where no evidence whatever was offered tending to prove that any other person committed the crime, the rule that a person charged with crime may offer testimony to show that another committed it is inapplicable. (*Post, pp.* 142-144.)

16. **CRIMINAL LAW.** Evidence as to pallbearers at funeral of father of witness held inadmissible.

In a prosecution of a negro for the murder of a woman, it was not error to refuse to allow a colored witness to testify as to who were the pallbearers at the funeral of witness' father; the father having died thirty-four years before. (*Post, p* 144.)

17. **CRIMINAL LAW.** Instruction as to prejudice of witness held properly refused.

In a prosecution of a negro for murdering a woman, it was not error to refuse to charge that the jury might consider whether a police officer suggested to an eyewitness the identity of the murderer if the officer stated to the driver of patrol wagon that defendant was the guilty party, and that officer had a grudge against him. (*Post, pp.* 144, 145.)

18. **CRIMINAL LAW.** Request incorporated in general charge held properly refused.

In a prosecution of a negro for murder of a woman, it was not error to refuse to charge that, if a witness bore a grudge against defendant, his evidence should be received with caution; the request having been properly submitted in the general charge. (*Post p.* 145.)

19. **HOMICIDE.**  Instruction as to motive of a third person not supported by evidence properly refused.

In a prosecution of a negro for the murder of a woman, it was not error to refuse to charge that, if another person had a motive and an equal opportunity to commit the crime, any presumption that might arise against defendant by reason of an alleged motive must be weakened and impaired; such request not being supported by evidence.  (*Post, pp.* 145, 146.)

20. **CRIMINAL LAW.**  Prejudice of juror in murder trial not sustained.

In a prosecution for murder, evidence on motion for new trial *held* not to sustain a charge that a juror had before the trial stated to another that he believed defendant was guilty and should be lynched.  (*Post, pp.* 146, 147.)

---

FROM KNOX.

---

Error to the Criminal Court of Knox County.—Hon. Xen Hicks, Judge.

Reuben L. Cates, Jas. A. Fowler, L. C. Houk, W. F. Yardley and John A. Huff, for plaintiff in error.

Frank M. Thompson, Attorney General, for the State.

Mr. Justice Hall delivered the opinion of the Court.

The plaintiff in error, Maurice Mays, was convicted in the court below for the murder of Mrs. Bertie Lindsay, and was sentenced by the jury to suffer death by electrocution.

A motion for a new trial was overruled, and the plaintiff in error has appealed to this court and has assigned errors.

The material facts of the killing lie within a narrow compass. On the night of August 29, 1919, an intruder entered the house of Mrs. Lindsay on Eighth avenue near Gillespie avenue in the city of Knoxville, and shot her to death. She was in bed with her cousin, Miss Ora Smith, who has since married a man by the name of Parsons, and no other person was in the house at the time. The facts are stated by Mrs. Parsons, who says that Mrs. Lindsay awoke her by calling her name and taking hold of her arm; that she observed a negro man standing in the room with a flash light; that Mrs. Lindsay arose and stood in bed, and the intruder commanded her to lie down or he would shoot her; that Mrs. Lindsay did lie down, but arose again and was again commanded to lie down. She did so, but again arose and stepped off of the bed onto the floor and looked out at a window. The intruder again commanded her to lie down or he would shoot her. Mrs. Lindsay then took a step towards the door, and the intruder shot her. She fell and soon expired, if not instantly. The intruder then turned to Mrs. Parsons, who was still lying on the bed, and put his hand on her person and said he had a good notion to shoot her, and made an indecent proposal to her, using language which she would not repeat because of its obscenity and profanity. She asked him to spare her life and take her money. The intruder asked her where her money was. She told him it was in a vase on the dresser. He then went to the dresser and found Mrs. Lindsay's purse and took it and departed through the back door of the house.

As soon as he was out of the house Mrs. Parsons made her exit through the front door and went to the house of her closest neighbor, Mr. Dyer, who was a patrolman for the city of Knoxville. Mrs. Dyer heard the sound of the pistol and went to her front door. Mrs. Parsons went to Mrs. Dyer's back door first and afterwards passed around to the front door.

The intruder, in passing out of the Lindsay yard, ran against a wire, which connected the house with a hedge fence, and fell down, dropping the purse which he had taken from the dresser, where it was later found. It seems that in leaving the Lindsay premises the intruder went down below the Dyer residence for a distance, and then turned and came back and passed in front of the Dyer residence while Mrs. Dyer was on the front porch. The Dyer front porch was some twenty-five feet from the street. By the aid of a strong arc electric light located near the corner of Eighth and Gillespie avenues, Mrs. Dyer saw the intruder as he returned. She says that he was walking rather leisurely with his flash light in his hand and burning, but had it turned down towards the pavement. She called to her husband, who was then engaged in dressing, and the intruder, upon hearing her voice, ran through an alley that opened on the opposite side of Eighth avenue practically in front of the Dyer residence and disappeared.

Mr. Dyer telephoned information' to police headquarters that Mrs. Lindsay had been killed. Capt. Wilson and four other policemen were sent to the scene, and arrived in about twenty minutes. They had an extended conversation with Mrs. Parsons about the killing, and she

gave to Capt. Wilson a full description of the person, clothes, and voice of the intruder, in consequence of which he detailed Patrolmen White, Hatcher, and Kirby to go and arrest the plaintiff in error.

The plaintiff in error lived about one mile from Mrs. Lindsay's house. The patrolmen did not know where he lived, but did know where his father lived, and went there first. There they learned where the plaintiff in error lived and went to his house. They walked up on the front porch and called repeatedly and somewhat loudly to plaintiff in error, but received no response. They then struck upon the front door with a policeman's billy and called each time the plaintiff in error's name. They did this repeatedly, but received no response. They then left the front porch and went to the house of his next neighbor, who had been awakened by the noise made by the patrolmen attempting to arouse the plaintiff in error. They asked him if Mays lived at this place, and he informed them that he did. They then asked him if Mays were at home, and he informed them that he supposed he was, as he had heard a noise at Mays' place about one hour before which sounded like some one had come in. They returned to the Mays house and made another effort to arouse him, but could not do so then went around to the side of the house and held a flash light to the window but could not see any one. They then went to another window and raised the shade and turned on the flash light and discovered that Mays was lying on the bed with his head to the foot of the bed. Patrolman Kirby says that he could see that Mays was not asleep. The officers returned to the door, and

knocking was again repeated on the door, when Mays responded to the calls which accompanied the knocking. The patrolmen say that they knocked very hard and made dents in the door; one of them saying that he knocked as hard as he could, not to knock the door down. Mays opened the door and admitted them, first giving as a reason for not opening the door sooner that he was asleep and did not hear their calls, but later said he did not admit any one in his house at night. The officers, upon being admitted, began a search of the house. They discovered that his pants were folded between the mattresses with the legs protruding from about the knees down. They say the pants were damp as if he had been walking in weeds. It had rained in the early part of the night in the section of the city where the murder was committed, and there were weeds and high grass in the alley, through which the intruder traveled as he left Mrs. Lindsay's house. They examined his shoes, and they had red mud and cinders on the bottoms and on the sides. The surface of the alley through which the intruder ran after the murder was composed of cinders and red clay. There was only a small quantity of red mud and cinders on the shoes.

They asked Mays for his pistol, and he informed them where it was. They examined the pistol and found it to be a 38 double-action Smith & Wesson. All of the chambers except one had the appearance of having been loaded for quite a while, but one had the appearance of having recently been fired and reloaded with a bright and fresh cartridge. Lint had gathered in the ends of all the chambers but one, and the cartridges in all the chambers

Mays v. State.

but one were corroded as if they had been carried in the pistol for quite a while. The barrel of the pistol gave evidence that it had been recently fired, and had a smell of fresh burnt powder. The plaintiff in error offered testimony to the effect that the pistol had been fired at a rat about four months previous. Mays also offered the testimony of himself, his father, and Jim Smith that the pistol did not bear the smell of fresh burnt powder.

There was considerable conversation between the plaintiff in error and the patrolmen in the house and on the way up to the corner of Eighth and Gillespie avenues, where he was halted under a strong arc light to be identified by Mrs. Parsons. The patrolmen say that they did not tell him why they were arresting him, or what had been done, but that he kept inquiring of the nature of the charge, and finally they told him that they were taking him up the street to see a lady for the purpose of identification. Mays replied that they were fixing to get him lynched, and that he wanted her to see him in the light so that she would know that he was not the man. They carried him up to this light and Mrs. Parsons was brought into his presence by Mrs. Dyer, Mr. Kirby, and Mr. White, and without hesitation she said Mays was the man who had shot Mrs. Lindsay. As she started away he called to her to come back and look at him again and say that he was not the man. She walked back and looked at him the second time and reaffirmed her identification of him as the intruder. He appealed to her the third time to say that he was not the man, but to this request she made no reply, and returned to the Dyer home from which she had come. The next morning he was brought before her

again, and she again expressed herself as having no doubt as to his being the intruder who shot Mrs. Lindsay.

Mrs. Dyer says that the man passed in front of her house and into the alley had the form, size, and clothes of Mays. It should be stated here that Mays had on a light grey suit that night, and a light grey suit in his house, and he had it on when the patrolmen took him to the corner of Eighth and Gillespie avenues to Mrs. Parsons. Both Mrs. Dyer and Mrs. Parsons identified the suit which the intruder wore at the time he entered the Lindsay home as a "dingy" grey.

A flash light was not found in Mays' house, and he says that he did not have one, and had not had one for several months. It had rained in the fore part of the night, but was not raining at the time of the murder. The alley was grown up in weeds and grass.

The tracks of the intruder were seen in the alley. The track of the right foot was rather plain, but it was not plain as to the left foot. Much attention is given to these tracks in the testimony and in the argument of counsel, but we doubt if the testimony as to them is of much service to the court in ascertaining the truth, but we think this testimony does not in any wise tend to discredit the testimony of Mrs. Parsons. Likewise much attention is given in the briefs of counsel and their oral arguments to the testimony concerning the condition of Mays' pants. Mays denies that his pants were damp, but the patrolmen all say they were, and the verdict of the jury, of course, has determined this issue of fact in favor of the State's contention, and the evidence does not preponderate against the jury's finding.

Plaintiff in error's defense is an *alibi*. Much of the record is taken up by testimony of his whereabouts from about noon on August 29th to about 12:30 that night. He accounts for himself during those hours by disinterested testimony, which shows that he went to divers and sundry places, engaged in the approaching city election, electioneering for Mr. McMillan, candidate for mayor, and distributing poll tax receipts but after that hour his whereabouts depend entirely upon his own testimony.

From his home on Hume street to the Lindsay home was nearly a mile, either more or less. It was walked by officers by two routes after the murder in twenty-three and twenty-four minutes, respectively, at a leisurely gate. It is indisputably shown that Mays could have been at the various places shown in the testimony, and could have gone to his home at 12:30, and then have gone to the Lindsay home and committed the crime as testified to by Mrs. Parsons and then returned to his home and retired before the officers appeared to arrest him. In other words, there is absolutely no conflict between the testimony of Mrs. Parsons and the various witnesses who testify as to Mays' whereabouts, except the testimony of Mays himself. From the time the crime was committed until the patrolmen came to the Lindsay home was about twenty minutes. They remained at that place, talking to Mrs. Parsons, twenty or thirty minutes, not less than twenty. The patrolmen say that it required about fifteen minutes for them to go to Mays' house, and that they remained there about thirty minutes, and it took about fifteen minutes to carry him to the corner of Eighth and Gillespie avenues, and into the presence of Mrs. Parsons.

145 Tenn.—9

If Mays had committed the crime and walked directly home at a leisurely gate, it would have taken him only from twenty-three to twenty-four minutes. So we have Mays at home off of his electioneering itinerary at 12:30 a. m. The intruder killed Mrs. Lindsay between two and three o'clock a. m. Therefore, in its last analysis, the testimony comes down to a conflict between Mrs. Parsons and Mays. Mrs. Parsons identifies Mays most positively, and says there is no doubt in her mind as to his identity. She says he entered the house and he fired the shot that killed Mrs. Lindsay.

Aside from Mrs. Parsons' testimony, we know that the ball which killed Mrs. Lindsay was a 38, because it was taken from her body soon after she was killed and identified as a 38 bullet. We know that Mays had a 38 pistol, and we are justified in inferring that Mays' pistol was fired a short time before the patrolmen arrested him. It was fired only once, and the man who killed Mrs. Lindsay fired only one shot. There is also the circumstance of the manner of his awakening when the patrolmen went to his house. The fact that he laid in the bed awake, and refused to answer the patrolmen when they called to him He says he was asleep, but Patrolman Kirby says that he was awake when he raised the shade and put his flash light in the room. Mays also offered another reason for not admitting the officers, which was that he did not allow people in his house at night.

We have the further evidence that some time after the commission of the murder Chief of Police Haynes and other officers of the city of Knoxville went to the Lindsay home and made an experiment with an ordinary flash light

at night, and at a time when Mrs. Parsons was present, and after she had arranged the furniture in the room where the murder was committed in the same way that it was arranged on the night of the murder; the room being decorated with very light paper, as it was on the night of the homicide. This experiment showed that a person could be easily seen in the room; his color distinguished; his form, general appearance, size, and features observed and noted. Some of the officers say that it was almost light enough in the room to enable one to see a pin on the floor. This evidence is uncontradicted, and strongly corroborates Mrs. Parsons in her statement that she was able to see and observe the intruder who shot Mrs. Lindsay in the same room on the night of August 29, 1919.

Furthermore, the testimony of Mrs. Parsons inspires confidence. She is careful in her statement of the facts, and there is nothing in her testimony to indicate that it should not be given full credence. She was the only person present except the victim of the intruder, and the record shows that she exercised remarkable coolness and caution in meeting the trying situation in which she was placed. It is true that she had never seen the plaintiff in error before, but she heard his voice on the night of the murder, quite a little conversation having occurred between them; she observed his form, face, and clothing while in the room; and within less than an hour after the murder she described to Capt. Wilson of the police force of the city of Knoxville the man who shot Mrs. Lindsay with such detail that Capt. Wilson, who knew Mays well, ordered the officers under him to go and arrest Mays.

When Mays was brought into the presence of Mrs. Parsons a few minutes later, at the corner of Eighth and Gillespie avenues, and while he was standing under or near a strong electric arc light at said corner, Mrs. Parsons promptly and positively identified him as the man who had killed Mrs. Lindsay. As an illustration of her cautiousness and an honest desire on her part not to make any mistake as to her identification of the intruder who killed Mrs. Lindsay, on the following morning she requested the officers that she be allowed to see Mays again, and upon his being brought into her presence at the city jail she, without hesitation, positively identified him again as being the man who shot and killed Mrs. Lindsay, and has remained positive in her identification of him ever since.

We are wholly unable to see any motive which Mrs. Parsons could possibly have in identifying Mays as the man who killed Mrs. Lindsay, except to speak the truth. It is shown that she had no previous acquaintance with him, and it does not appear that she could possibly have had any ulterior motive in her identification of Mays as the perpetrator of the murder.

It is said by counsel for Mays that when Mrs. Parsons was brought into his presence at the corner of Eighth and Gillespie avenues shortly after his arrest she was very much excited and in a state of collapse, and had to be supported by Mrs. Dyer and Officer White, and that therefore her identification of Mays should be discredited.

This contention is not sustained by the evidence. It does appear that when she was brought into the presence of Mays she was accompanied by Mrs. Dyer and

Mays v. State.

Officers White and Kirby, and that Mrs. Dyer and Officer White were walking on either side of her and had hold of her arms, but there was nothing in her manner or conduct that showed that she was in a state of collapse, or that she was not in full possession of her mental faculties. Officers Kirby and White had been sent to the Dyer home to get Mrs. Parsons and bring her in the presence of Mays, and this accounts for them accompanying her to the point where she identified Mays as the man who had shot and killed Mrs. Lindsay, and the preponderance of the evidence shows that she did not have to be supported or carried. As evidence that she was in full possession of her mental faculties, after she had first positively identified Mays as the guilty man, and had started away, he requested her to come back and look at him again and tell the officers that he was not the man who had killed Mrs. Lindsay. She then turned and came back and looked at him a second time, and again identified him as being the guilty man.

It is said for the defense that a suggestion was made to Mrs. Parsons by Officer White, while on the way with her from the Dyer home to the point where she identified Mays, that he was the guilty man, and that it was upon the suggestion of White that she made her identification.

There is no evidence in the record of any such suggestion having been made by Officer White. Mrs. Dyer, Officer Kirby, and Officer White all say that no such suggestion was made to her at any time; in fact, they say that no suggestion was made to Mrs. Parsons whatever as to who was guilty of the murder of Mrs. Lindsay Mrs. Parson says no suggestion was made to her.

The defense did offer the testimony of Jim Smith, the colored driver of the patrol wagon, who accompanied Officer White to the scene of the murder from the police station, to the effect that White said to him on the way to the scene of the murder that he would bet that that "G—— d—— Maurice Mays killed that woman." Officer White emphatically denied that he made any suggestion or statement to Jim Smith, or to any other person.

The jury evidently discredited the statement of Smith on this point, and, we think, rightly so. It does not appear from the evidence that White knew anything about the particulars of the murder at the time he and Smith left the police station with the patrol wagon. He had only been informed by the desk sergeant at the police station that Mrs. Lindsay had been killed. It is utterly unreasonable that he would have made any such suggestion or statement to Jim Smith on the way to the Lindsay home when it is not shown that he had any infortion whatever as to who had killed Mrs. Lindsay. Furthermore, we think that Smith's testimony shows that he is very much biased in behalf of Mays, and his testimony is not entitled to credit. We do not think there is anything in the record which reflects on the integrity of Officer White. Some evidence was offered by the defense tending to show that he entertained a feeling of animosity towards Mays. This White denies. He does say that Mays had sought to interfere with him in the discharge of his official duties on more than one occasion, and that he told Mays on one occasion, at least, that he would go to the penitentiary if he did not quit his ways, and that he (White) would break his head if he continued to interfere

with him in the discharge of his duties. We gather from White's testimony that he probably had a contempt for Mays' previous conduct. He denies, however, that he entertained a feeling of animosity or hatred towards him; but, if it be conceded that he did entertain a feeling of animosity towards Mays, this is immaterial, because it is not shown that he made any suggestion to Mrs. Parsons or in any way aided her in the identification of Mays.

It is said that the officers were unable to find a flash light in Mays' house, and that this is a circumstance against his guilt.

It is true that this is a circumstance in his favor, but it is only a circumstance. It is not sufficient to warrent this court in holding that the evidence preponderates against the verdict. Mays could easily have disposed of his flash light or secreted it where it could not be found on his way from the scene of the murder. It is said in his behalf that he did not have in his possession a flash light for several months before the murder was committed, and that he had loaned his flash light to a deputy sheriff some months before the murder, and that it had not been returned to him at the time of the murder. This fact is not entitled to any very great consideration in the determination of Mays' guilt or innocence. It is a matter of general knowledge that flash lights are a very common device, and are in general use· everywhere, and are easily and cheaply obtained.

This case has been tried twice. Mays was convicted and sentenced to death on his first trial, but upon an appeal to this court the conviction was reversed because the jury failed to fix and assess the punishment in accordance with the provisions of chapter 5 of the Acts of 1919, which provides:

"When any person is convicted of the crime of murder in the first degree, or as an accessory before the fact of such a crime, it shall be the duty of the jury convicting him in their verdict to fix his punishment, which punishment shall be death in the mode prescribed by law for the infliction of the death penalty in capital cases, or the jury may, if they are of opinion that there are mitigating circumstances, fix the punishment at imprisonment in the penitentiary for life, or for some period over twenty years."

Upon the first trial the trial judge undertook to apply the law as it had existed before the passage of the act of 1919, instead of having the jury to assess and fix the penalty as a part of their verdict.

Upon the second and last trial Mays was tried before a different jury and was convicted and sentenced to death by electrocution. This trial was presided over by another Judge, Hon. Xen Hicks, who was appointed by the Chief Justice of this court to preside at said trial as provided by statute. The learned trial judge who presided at the first trial, Judge Nelson, expressly approved the verdict of the jury. The verdict rendered by the jury on the last trial was approved by Judge Hicks. So the facts proven have been held to warrant the death penalty by two judges and two juries.

It is a well-established rule of this court that after the accused has been convicted by a jury in the lower court, and the verdict has been approved by the trial judge, in order for him to have a reversal of the judgment of the lower court upon the facts, he must show that the evidence preponderates against his guilt and in favor of his innocence. *Cooper* v. *State,* 123 Tenn., 37, 138 S. W., 826.

Now, has the plaintiff in error done this? We think not. The plaintiff in error's defense is an alibi. In this defense he has wholly failed. He wholly failed to account for his whereabouts between the hour of 12:30 on the night of the murder and the hour at which the murder was committed, which was about 2:30 or 3 o'clock in the morning. The evidence unquestionably shows that he could have gone to his home at 12:30 and then have gone to the Lindsay home and committed the murder at 2:30 or three o'clock, and would have had time to have returned to his home and retired before the officers appeared to arrest him. In view of the testimony of Mrs. Parsons, who positively identifies him as the man who shot and killed Mrs. Lindsay, and in view of the corroborative circumstances which support her testimony, we cannot hold that the evidence preponderates against the verdict. Upon the other hand we think the preponderance of the evidence supports the verdict. The plaintiff in error was not convicted upon circumstantial evidence. The principal evidence going to establish his guilt in the positive testimony of Mrs. Parsons, who identifies him as the man who murdered Mrs. Lindsay. The evidence tends to show that Mays is a man of bad character. He admits that he is now under three other indictments in Knox county. He ran a disreputable place, harbored criminals, and frequently went to the city court and made their bonds when they were arrested. The plaintiff in error's assignment of error challenging the sufficiency of the jury's verdict on the facts will be overruled.

By the second and third assignments of error it is insisted that the trial judge committed error in refusing

to permit Chief of Police Ed. M. Haynes, on the objection of the State, to answer the following question propounded to him by the defense on cross-examination:

"Q. Did you not, as chief of police, having seventy-five or one hundred men under you, knowing of this mob which attacked the jail, go home and refuse to take any stand against the mob notwithstanding you was a sworn officer to preserve the peace?"

Also in refusing to permit Capt. Wilson of the police force to answer the following question: ·

"Q. Did you not, as captain of the police, referring to the mob which followed the killing of Mrs. Lindsay, refuse to make any effort to quell the mob?"

The record fails to show what the answers of Chief of Police Haynes and Capt. Wilson would have been to these questions, respectively, if they'had been permitted to answer them. We are not able to conceive how the plaintiff in error was prejudiced by their failure to answer them. There was no evidence offered tending to show that Mays was in the jail at the time it was attacked by the mob, and that it was necessary to protect him against the mob. The proof tends to show that Mays had been taken out of the jail and removed to Chattanooga. The answers of Chief of Police Haynes and Capt. Wilson relative to the mob attacking the jail would have probably been more prejudicial to the plaintiff in error than helpful. The answers could not have possibly thrown any light upon the guilt or innocence of the plaintiff in error, and were not competent as going to the witnesses' credibility, because the omissions of the officers did not involve moral turpitude. There is no reversible error in

the action of the court refusing to permit said witnesses to answer these questions.

By the fourth assignment of error it is insisted that the trial court erred in permitting testimony to go to the jury to the effect that Mrs. Parsons, after identifying, the plaintiff in error as the man who had killed Mrs. Lindsay, and after he had denied his guilt, stated to him, "If I had a pistol I would or could kill you."

The thought seems to be that after plaintiff in error denied his guilt that nothing which Mrs. Parsons said to him could be considered  This is an erroneous view. We think that it was entirely competent to prove the conversation that occurred between plaintiff in error and Mrs. Parsons on that occasion. The remarks which Mrs. Parsons made were made at the time she identified the plaintiff in error, and were a part of the identification.

By the fifth assignment of error it is insisted that the trial court erred in refusing to allow Policeman Sanders to testify, in response to questions propounded in behalf of the plaintiff in error, that when he (Sanders), after the murder of Mrs. Lindsay was committed, rang in to report to O. J. Watkins, desk sergeant at police headquarters, Watkins, acting in the line of his duty and under the rules of the police department in such cases, stated to Sanders that a woman had been killed on Eighth avenue, and that the man who killed her was a low, black man and wore overalls.

There was no error in the exclusion of this testimony. It was clearly not competent, because it was merely hearsay testimony.

By the sixth assignment of error it is insisted that the trial court committed error in refusing to admit testi-

mony offered by the plaintiff in error to the effect that, subsequent to the murder of Mrs. Lindsay, the homes of a number of women had been entered by some person, and either assaults or attempted assaults of a similar nature made upon females. This testimony relates to similar assaults made upon the witnesses themselves, or other female occupants of the houses which had been entered.

It is insisted by the defense that this testimony was competent because, at the time said assaults were made, plaintiff in error was being incarcerated in the Knox county jail, and could not have committed said assaults, and that said testimony tended to elucidate the crime with which plaintiff in error is charged, and show that it was committed by some person other than plaintiff in error.

The general rule has been well established that on prosecution for a particular crime evidence which in any manner shows or tends to show that the accused has committed another crime wholly independent of that for which he is on trial, even though it be a crime of the same character, is irrelevant and inadmissible; but to this rule there are several exceptions. This general rule does not apply where the evidence of another crime tends directly to prove defendant's guilt of the crime charged. Evidence which is relevant to defendant's guilt is not inadmissible because it proves or tends to prove him guilty of another and distinct crime. It frequently happens that two distinct offenses are so inseparably connected that the proof of one necessarily involves proving the other, and in such a case on a prosecution for one evidence proving it cannot be excluded because it also

Mays v. State.

proves the other. Evidence of another and distinct crime is admissible if it was committed as a part of the same transaction and forms part of the *res gestæ*.

It has been said that evidence of other crimes committed by the accused is relevant to prove his identity; but it is more correct to say that, where the commission of a crime is proven, evidence to identify the accused as the person who committed it is not to be excluded solely because it proves or tends to prove that he was guilty of another and independent crime.

When the nature of the crime is such that guilty knowledge must be proved, evidence is admissible that at another time and place not too remote the accused committed or attempted to commit a crime similar to that charged.

Also evidence of other crimes committed by the accused similar to that charged is relevant and admissible when it shows or tends to show a particular criminal intent, which is necessary to constitute the crime charged.

Evidence is also admissible to show motive prompting the commission of the crime charged by the accused, and is admissible notwithstanding it also shows the commission by the accused of another crime of a similar character. Thus it may be shown that the crime charged was committed for the purpose of concealing another crime, or to prevent the accused from being convicted of another crime. But evidence of another crime which has no connection with that for which the accused is on trial, and which, therefore, is not relevant to prove motive, cannot be introduced under the guise of proving motive.

It is also admissible, where the crime charged is a part of a plan or system of criminal action, to offer evidence of other crimes near to it in time and of similar character, to show the knowledge and intent of the accused, and that the crime with which he is charged was not the result of accident or inadvertence. This rule is often applied where the crime charged is one of a series of swindles or other crimes involving a fraudulent intent for the purpose of showing this intent. Cyc., vol. 12, pp. 405-409, 411.

To the same effect are these exceptions to the general rule stated in our own cases. *Parrish* v. *State,* 129 Tenn., 274, 164 S. W., 1174; *Gardner* v. *State,* 121 Tenn., 709, 120 S. W., 816; *Holder* v. *State,* 119 Tenn., 210, 104 S. W., 225; *Peek v. State,* 2 Humph., 78.

But, where the collateral fact offered in evidence is incapable of elucidating the principal matter in dispute, it is error to admit it. *Queener* v. *Morrow,* 1 Cold., 123.

A full discussion of the general rule, with its exceptions, is found in *People* v. *Molineux,* 168 N. Y., 264, 61 N. E., 286, 62 L. R. A., 193, and the very elaborate notes thereto.

It has been repeatedly held by this court that it is admissible for a person charged with a crime to offer testimony which tends to show that another particular person committed it; and further, that any proof would be admissible to establish this fact which would have been admissible against the individual whom it is attempted to show was guilty of the crime, if he had been on trial therefor. *Hensley v. State,* 9 Humph. 243; *Sible* v. *State,* 3 Heisk., 139.

This rule, however, cannot be invoked in the case un-

der consideration, because no evidence whatever was offered which tended to prove that any other person committed the particular crime with which the plaintiff in error is charged. There is no proof of the identity of any person connected with the subsequent crimes sought to be proved by the plaintiff in error. It results, therefore, that the proof offered by plaintiff in error of the several subsequent similar crimes, while it did tend to show that houses had been entered and similar assaults had either been committed or threatened, none of it tends to establish that any person other than plaintiff in error committed the particular crime under consideration.

We have not been cited to any case by counsel for plaintiff in error, and have been unable to find any case ourselves, after a careful investigation, and we do not believe any can be found, which holds that such evidence is competent.

We think it will be readily conceded that, if the state had offered evidence for the purpose of showing motive on the part of the plaintiff in error to commit the crime for which he stands convicted, to the effect that previous similar crimes had been committed in the city of Knoxville, without showing that plaintiff in error was in any way connected with them, such evidence would not have been admissible, because it would have in no way connected plaintiff in error with such previous crimes, and would not have tended to establish any motive on his part to commit them. Then how can it be said that evidence of subsequent, independent, and similar crimes is competent as tending to show a lack of motive on the part of the plaintiff in error to commit the crime

for which he stands convicted without offering to show any fact which tends to connect any particular person or individual with said crimes? We do not think such evidence is admissible under any rule of law. Such evidence would in no way have tended to elucidate the crime for which the plaintiff in error stands convicted.

By the seventh assignment of error, which is erroneously numbered the sixth also, it is insisted that the court below erred in refusing to allow James Smith, whom the proof shows is a colored man, to testify that Gov. Robert L. Taylor, Gen. J. C. J. Williams, Judge J. F. J. Lewis, Col. Samuel B. McKinney, Judge James E. King, and Capt. Alex Allison were pallbearers at the funeral of Mose Smith, the father of said witness.

We cannot see any error in the action of the court in excluding this evidence. It would not have shed any light on the credibility of the witness Smith. The evidence shows that the witness' father died and was buried some thirty-four years prior to the date said testimony was offered, and the question of who acted as pallbearers at his funeral would have shed no light whatever upon the witness' credibility.

By the eighth assignment of error, which is erroneously numbered the seventh, it is insisted that the court erred in refusing to give in charge the plaintiff in error's special request to the effect that, if on the way to the scene of the murder shortly after it occurred, the witness White, knowing that a woman had been shot or killed, and had not received a description of the plaintiff in error, stated to James Smith that Maurice Mays was the guilty

party, and that the said White had a grudge against Mays, or entertained a feeling of animosity towards him and had previously threatened him, then the jury might consider whether White saw Mrs. Parsons at the scene of the homicide, and whether he (White) suggested to her that the plaintiff in error was the guilty person.

This request was properly refused, because there is no evidence in the record whatever tending to show that White made any suggestion to Mrs. Parsons that plaintiff in error was guilty of having killed Mrs. Lindsay. But, as before stated in this opinion, it is shown by the testimony of White, Mrs. Dyer and Kirby, who accompanied Mrs. Parsons from the Dyer home up to where she identified Mays, that White did not make any suggestion whatever with respect to plaintiff in error, or his identity.

It is further assigned as error that the trial judge failed to charge the following special request of the plaintiff in error:

"I charge you that if said White bears a grudge or ill feeling against Mays that then you should receive his evidence with caution, because ill feeling, prejudice, and bias are apt to influence a witness in his testimony."

This request was inaccurate and unsound. Furthermore, the matter involved in this request had properly been submitted to the jury in the court's general charge.

It is also assigned as error that the court erred in refusing to give in charge the defendant's special request as follows:

"If another person had a motive and an equal opportunity to commit the crime, then any presumption that

145 Tenn.—10.

might arise against Mays by reason of an alleged motive would be weakened and impaired, and you should so consider it.''

This request was properly refused, because there was no evidence offered which called for such a charge. There was no evidence offered which tended to show that any other person had a motive to commit the crime, or an equal opportunity to commit it. No evidence was offered which tended to connect any other person with the murder of Mrs. Lindsay.

It is next insisted that the juror Howell, upon his *voir dire*, stated, in substance, that he had not formed or expressed an opinion as to the guilt or innocence of the plaintiff in error, and by reason of said st 'ement plaintiff in error accepted said Howell on the jui  's, in truth and in fact, the juror Howell was partial and rejudiced against the plaintiff in error, and had formed and expressed an opinion touching the guilt of the plaintiff in error and had stated, in substance, before he was accepted as a juror, that said plaintiff in error was guilty of the murder of Mrs. Lindsay and should be lynched.

In support of his contention that this was the situation of the juror Howell, plaintiff in erorr, on his motion for a new trial, offered the testimony of J. G. Wyrick, which is to the effect that he lived at Bearden, was in business there, and that the juror Howell also lived there, and from time to time worked for him (Wyrick) ; that he had heard Howell express his belief that the plaintiff in error was guilty, and also say that it would not have mattered if he had been caught by the mob.

Mays v. State.

In contravention of this evidence the juror Howell testified that he did not make the statement which Wyrick attributed to him. He further denied that he had ever talked to any of the witnesses or anybody who undertook to give him a detailed statement of the facts connected with the murder of Mrs. Lindsay, and denied that he had formed or expressed an opinion as to the plaintiff in error's guilt, or had any prejudice against him when he entered the jury box, and states that he tried plaintiff in error according to the law and the evidence.

In view of the testimony of the juror Howell, which the trial court accepted, we cannot hold that the juror Howell was disqualified from sitting as a juror at the trial.

This disposes of the assignments of error urged by the plaintiff in error. Each member of the court has given this case an independent and painstaking investigation in an effort to arrive at the truth, and all concur in the conclusion that the judgment must be affirmed.

The plaintiff in error will therefore be committed to the custody of the warden of the State penitentiary to be kept by him safely within the walls of said penitentiary until the 15th day of December, 1921, at which time, and within lawful hours, he will put the plaintiff in error to death in the manner prescribed by the statute.