ROBERTS *v.* STATE.

(*Nashville,* December Term, 1950.)

Opinion filed January 13, 1951.

Jim C. Galloway, Harry Jamerson and Ike R. Clinton, all of Memphis, for plaintiff in error.

Nat Tipton, Asst. Atty. Gen., for the State.

Mr. Justice Tomlinson delivered the opinion of the Court.

This is an appeal by Churchill Roberts from a conviction of petit larceny with a four months workhouse sentence and judgment of infamy upon an indictment which charges him with stealing cotton worth $60.98 from its alleged owner, Hohenberg Brothers Company, a corpora-

tion engaged on a very large scale in the buying and selling of cotton with offices located in Memphis. The principal insistence is that the evidence is insufficient either in fact or law to support his conviction.

An owner desiring to sell his bales of cotton stores them in an appropriate warehouse. Each bale is identified by a number stamped thereon, and perhaps by a perforated attached tag upon which is written, possibly in duplicate, this identifying number. About a pound of cotton is taken from the body of each bale as a sample to be sent a prospective purchaser for examination as to quality, texture, etc. That sample is wrapped, and attached thereto is a tag on which is written the same identifying number as that upon the bale from which it is taken. This sample with that tag so attached is then sent to the prospective purchaser. If the prospective purchaser buys the cotton, as we understand the record, when the bale of cotton is sent to such purchaser in the usual course of business, it is examined and in some recognized manner, and if it turns out that the quality, etc. is not in fact the same as that represented, then the sample is returned to the seller of the cotton with the view of reconciling their differences, or for rejection. In other instances, as we understand the record, cotton of certain quality is sold, and a sample of the cotton so sold sent the purchaser. If that sample is not in accord with the quality, etc. which the buyer thought he was getting, then the sample is returned to the seller for such reconciliations or rejections.

In the building maintained by Hohenberg Brothers Company in Memphis for the carrying on of this business is a rather large room which is called the "sample room". In that sample room is a long table. The samples of cotton hereinabove mentioned, together with at-

tached tags, are placed on this table where they are examined by its experts.

When these samples of cotton have served all their purposes, hence no longer needed, they, together with the tags, are brushed from the table to the floor. Obviously, very many samples did in this manner find their way to the floor of Hohenberg's sample room during the course of a day's business.

There is a chute leading from the floor of this sample room to the basement of Hohenberg's building. At the close of the day's business, or perhaps at appropriate times during the day, these samples of cotton together with the accompanying tags are swept from the floor of the sample room into the chute, and hence are carried by gravity to the basement. The samples of cotton thus conveyed to the basement have in the aggregate, substantial value. Such cotton is called "loose cotton". This loose cotton is sold to cotton firms engaged in that business. One such firm in Memphis is the Dixie Pickeries Company.

Hohenberg, during the interval in question here, sold its above described loose cotton to the aforementioned Dixie Pickeries. Under the arrangement between Hohenberg and the Dixie Pickeries a servant of the Dixie Pickeries performed the service of driving its truck to the basement of Hohenberg to pick up this loose cotton for delivery to the Dixie Pickeries as the cotton of Hohenberg. During the period in question here a darky by the name of Vernon Houston was the servant of Dixie Pickeries who operated this truck and procured this loose cotton from the basement of Hohenberg.

It was a part of the duty of Dixie Pickeries' servant, Houston, to gather this loose cotton from the floor of

the Hohenberg basement and place it in a burlap sack. When that sack was filled with this loose cotton it was closed and sewed. Then Pickeries' servant, Houston, wrote the name Hohenberg Brothers Company on a tag attached to this sack of cotton, thereby indicating Hohenberg to be its owner. In the process of transferring this loose cotton into a sack many of the aforementioned identifying tags attached to the samples likewise get into the sacks in which the cotton is. Such sacks of loose cotton are known in the cotton business as "snakes".

The next step taken by Houston in consummating the sale of these snakes of cotton from Hohenberg to Dixie Pickeries was to drive the truck to the public scales maintained by the City of Memphis and have this cotton weighed in the name of the person represented by Houston to be its owner. The dray tickets and the snakes of cotton are then carried by Houston to the Dixie Pickeries and the dray tickets delivered to its office. Promptly thereafter in the usual course of trade the Dixie Pickeries Company issued its check for the purchase price due the person shown by these tickets to be the owner of the cotton.

It is for the alleged stealing of one of these snakes of cotton from Hohenberg that Roberts stands convicted in this case.

During the period here involved Roberts was employed full time by a cotton firm known as the Saxon Company and, so far as known by Mr. Saxon, the defendant Roberts was not in the business of buying or selling loose cotton, and was intended not to be.

On or about January 20, 1949 cotton dealers in Memphis concluded that somebody was stealing "loose cotton". The police department was consulted, and an investigation immediately started. A number of negroes

who worked for various cotton firms were brought, for one reason or another, to the police station and questioned.

As a result of the questioning of these darkies, representatives of the police department and of the District Attorney General's office went to the place of business of the Dixie Pickeries Company. There they found a snake of cotton with a tag thereon showing plaintiff in error, Churchill Roberts, to be its owner. His name was written thereon by Vernon Houston, the aforementioned servant of Dixie Pickeries who had been picking up Hohenberg's loose cotton. The dray ticket showed that the loose cotton had been weighed at the Memphis public scales in the name of Churchill Roberts at the direction of the aforementioned Vernon Houston. A check in payment for this cotton had been issued by the Dixie Pickeries payable to plaintiff in error, Roberts, and was in its office at that time. The representatives of the Memphis Police Department and the District Attorney General's office cut this snake of cotton open and therein found a number of the aforesaid tags, sometimes called "drop tags".

At this point it is appropriate to observe that a card is made for each bale of cotton purchased and/or sold by Hohenberg Brothers Company. These cards contained just about all the history connected with that bale of cotton. At the time this investigation was being made Hohenberg's files contained more than three hundred thousand such cards. Once the bale of cotton had been placed in the channels of commerce, and Hohenberg has no further interest therein, or whatever finally happens to it, these cards are placed in a permanent file not readily accessible.

Hohenberg, as presumably do other cotton dealers, has some arrangement of its own of numbers whereby it may be readily recognized by it that the number on a given tag refers to cotton owned by it. There is a concern in the United States which produces and operates for large concerns a very complicated machine called an ''IBM'' machine. Its operation for its clients is by an expert in that line; in this instance, a man by the name of Coble. Hohenberg Brothers Company was a client of the concern which operates these machines and such a machine was located somewhere in Hohenberg's building.

When the expert operator of this machine is given the number on a given tag, then, by a complicated operation process of that machine, he is able to tell from such operation of the IBM the information contained on the aforementioned card about the cotton identified by this number. In response to a question as to whether that machine would make a mistake he testified that ''it is possible but very unlikely''. After the cards are placed in the permanent files it takes a great deal of time to produce them in Court. In this instance it was testified that under prevailing conditions it would probably take two or three months.

As aforesaid, in the snake of cotton with Roberts name attached thereto as the owner there were found drop tags with identifying numbers, and at least one other important piece of scrap paper hereinafter to be mentioned. These tags, etc. were taken to the office of Hohenberg Brothers Company. One of its officers, Mr. Threefoot, recognized the numbers shown on these drop tags, etc. to be those used by his company with reference to its cotton. Nevertheless, these numbers were given to Coble, the expert operator of the IBM machine. He

operated the machine with reference to what it would show as to the ownership of the cotton referred to by these tags. That machine identified the owner of the cotton represented by these tags to be Hohenberg Brothers Company and this was testified to over the objection of Mr. Roberts on the ground that the cards themselves were the best evidence. Since a considerable period of time had elapsed between the time of this original investigation and the trial of Mr. Roberts, the original cards had been placed in the permanent file; so, not reasonably accessible for use at the trial.

Mr. Threefoot, an official of the Hohenberg Brothers Company, personally recalled the transaction with reference to certain cotton referred to by the tags found in the snakes of cotton in question. The cotton had been sold to a concern in some other state. That concern did not consider the bales of cotton to be as represented by the samples which had been submitted. Accordingly, it had sent these samples back to Hohenberg for the purpose of adjustment or rejection. Mr. Threefoot had personally handled the transaction very shortly prior to the time of finding the snake of cotton in question here and had made some memorandum on a yellow piece of paper. That yellow piece of paper was found in this snake of cotton. The memorandum thereon was in Threefoot's handwriting. After it had served its purpose he had thrown it on the floor from the sample table. Mr. Threefoot immediately recognized it, and recalled this transaction of very recent origin.

Mr. Threefoot's testimony is not contradicted in any manner. The only reasonable conclusion which can be reached from that testimony is that the cotton found in the snake involved here at the Dixie Pickeries place of business came from the basement of Hohenberg

Brothers, and was taken from that basement by Houston, the servant of Dixie Pickeries, and caused by him to be weighed in the name of the plaintiff in error, Roberts, and by Houston in writing identified as being the property of Roberts.

Immediately after the aforementioned investigation, Mr. Saxon, the employer of Roberts, was requested by the police department to bring Roberts to the police station. This was done. Roberts was confronted by these darkies. One of them, an employee of some firm other than Dixie Pickeries, stated that Roberts had given him some money on one occasion. Roberts denied it, and there stated in response to a question that he was not engaged in the sale of loose cotton. He made such denial emphatically and more than once. Such denial was entirely contrary to the truth. He there denied any knowledge of or connection with the particular sack of cotton which had been found at the Dixie Pickeries with his name thereon.

It was established by the testimony of Mr. Murtaugh, the secretary-treasurer of the Dixie Pickeries, that plaintiff in error Roberts had sold them loose cotton during the period of time involved here. The total amount paid him for such loose cotton during this period amounted to thousands of dollars. The procedure employed throughout this period in such sales was that Vernon Houston, the employee of Dixie Pickeries, had the loose cotton in question weighed out at the public scales in the name of Churchill Roberts as the owner, as shown by the dray tickets, and then delivered that cotton to his employer the Dixie Pickeries. The Dixie Pickeries in each instance then issued its check payable to Roberts as the owner. It was the practice of Roberts to come by the office the day following and pick up the check. Roberts

did not testify in this case, and offers no explanation as to whence came all this cotton for which he had thus received payment.

■ There is but one possible conclusion on the facts that can reasonably be reached in this case. That conclusion is that Roberts and Vernon Houston, the servant of Dixie Pickeries, had entered and put into effect in the manner above mentioned a conspiracy to take the loose cotton of Hohenberg Brothers Company and sell it as cotton belonging to Roberts, and that as a result of this conspiracy the cotton in the sack, (snake) involved here was fraudulently taken from Hohenberg's basement by Houston and weighed at the public scales in the name of Roberts and delivered to Dixie Pickeries as the cotton of Roberts.

An insistence made in behalf of Roberts is that, with the exception of the snake of loose cotton in question, it was error for the Court to permit the introduction of evidence as to other sales of loose cotton made during this period by Roberts to the Dixie Pickeries.

Roberts had denied emphatically, and more than once during the investigation, that he had engaged in the sale of loose cotton during this period. As heretofore observed, the testimony of Mr. Threefoot conclusively established it as a fact that the snake of loose cotton which Roberts is charged with having stolen came from Hohenberg's place of business. It is also established beyond doubt that Vernon Houston picked up this cotton and had it weighed at the public scales in the name of Roberts and delivered it to his employer, the Dixie Pickeries, as the property of Roberts.

The evidence objected to is of many other instances during this period in which Houston had caused cotton to be weighed in the name of Roberts at these public

scales and delivered to the Dixie Pickeries as the cotton of Roberts, and for which Roberts invariably and promptly called at the office of Dixie Pickeries to collect the purchase price. But, notwithstanding all this, Roberts, when questioned by the investigators here, emphatically asserted that he had not engaged in the sale of loose cotton during that period.

 In the situation just stated, evidence of these other transactions was clearly competent. Such evidence is admissible "where the crime charged is a part of a plan or system of criminal action, to offer evidence of other crimes near to it in time and of similar character, to show the knowledge and intent of the accused, and that the crime with which he is charged was not the result of accident or inadvertence. This rule is often applied where the crime charged is one of a series of swindles or other crimes involving a fraudulent intent for the purpose of showing this intent." *Mays* v. *State,* 145 Tenn. 118, 142, 238 S. W. 1096, 1103.

Another insistence of Mr. Roberts is that it was error to permit the operator of the IBM machine to testify as to what that machine said were the contents of each card on which was recorded the complete history of the bale of cotton. The theory of this insistence is that the card was the best evidence of its contents.

The uncontradicted testimony of Mr. Threefoot leaves no doubt but that Hohenberg was the owner of the snake of loose cotton which Roberts is convicted in this case of having stolen. The record is equally as conclusive that the theft was committed by Roberts and Houston in the manner above stated as the result of a conspiracy to that effect between the two. Under this evidence alone the jury was left no reasonable alternative other than

that of finding Roberts guilty of having stolen the snake of cotton in question.

■ Assuming, therefore, that it was error to permit evidence of the recordings of the IBM machine, it must nevertheless be concluded by reason of Code Section 10654 that it was not error for which this Court is permitted to reverse in this case. This because it does not affirmatively appear that the error complained of has affected the result of the trial. On the other hand, it may very well be said that it affirmatively appears that such evidence did not affect the result of the trial. Entirely independent of the evidence furnished by the IBM machine the other evidence herein related was so conclusive that the jury could have reached reasonably no other conclusion than that Roberts was guilty of the larceny of the cotton specified in the indictment.

It is contended, however, that Roberts could not be guilty of larceny as a matter of law, in that, so it is said, no trespass was committed in taking the cotton from the possession of its owner Hohenberg Brothers Company.

Hohenberg Brothers Company did consent that Vernon Houston take this cotton from its basement for delivery to Dixie Pickeries Company, such delivery to be in the name of its owner, the Hohenberg Brothers Company. Therefore, the just above stated insistence made in behalf of plaintiff in error Roberts would have to be sustained if we were compelled to follow the old rule as announced in *Felter* v. *State*, 17 Tenn. 397, 400, wherein it is held that larceny cannot be committed when "the legal possession of the goods passes by the delivery and consent of the owners", there being in that situation an absence of technical trespass.

In the Code of 1858 after the decision in *Felter* v. *State*, there was inserted what is now Code Section 10923, it

being Code Section 6545 in Shannon's Code, *Marler* v. *State,* 144 Tenn. 56, 229 S. W. 384. The provision of Code Section 10923 is: "If a contract of loan for use, or of letting and hiring or other bailment or agency, be used merely as the means of procuring possession of property with an intent to make a fraudulent appropriation at the time, it is larceny".

Some years subsequent to the enactment of Code Section 10923 this Court held in *Collins* v. *State,* 83 Tenn. 68, 69, that where goods are obtained by fraud, stratagem or artifice the offense is not larceny, unless the owner's intention in surrendering possession was "to part only with the temporary possession for a limited and specific purpose, retaining the ownership in himself". This holding seems to have been directly in conflict with the rule stated in *Defrese* v. *State,* 50 Tenn. 53, 54, 59-61, wherein it is said that "where the possession alone, and not the right of property is obtained by fraud or other illegal means accompanied by the felonious intent, it is larceny".

*Mitchell* v. *State,* 92 Tenn. 668, 23 S. W. 68, 69, in discussing Code Section 10923, supra, says with reference to the Felter case, supra, that: "An application of that statute to facts practically identical with those disclosed in Felter's Case, with a result exactly the reverse, is found in *Coldwell* v. *State,* 3 Baxt., at page 430."

It will be observed in the Mitchell case from which we have just quoted that the owner of the $20.00 turned it over to the defendants with no intention that this money be redelivered to him and this was done through fraudulent and false inducement of the defendants. It was there held that under Code Section 10923 the taking of the $20.00 was larceny. This case seems to reach, there-

fore, exactly the reverse conclusion from that reached in the Felter case.

■ If after *Mitchell* v. *State,* supra, any doubt was left as to the law mentioned in the Felter case being no longer recognized as the proper rule in the application of Code Section 10923, that doubt was removed by the case of *Marler* v. *State,* 144 Tenn. 56, 229 S. W. 384. In that case the prosecutor delivered $500.00 to the defendant upon the false and fraudulent representation of the defendant that it was to be used in the purchase of a certain quantity of whiskey which the two were to sell for a profit. There was no such whiskey, and the defendant at once spent the money for his own uses. This Court sustained his conviction of larceny, under Code Section 10923 and therein reiterated the rule announced in *Mitchell* v. *State* to the effect that Code Section 10923 was intended to change the rule announced in the Felter case, which rule as announced in the Felter case was that there can be no larceny in the absence of technical trespass, though the party charged obtained possession of the property by fraud upon the owner with the felonious intent of converting it to his own use. It is generally held that constructive possession in furtherance of the common and fraudulent design is sufficient since both are guilty as principals. 42 A. L. R. 273.

■ Roberts and his co-conspirator, Houston, obtained possession of this cotton of Hohenberg by a fraud, in that Hohenberg surrendered possession with the belief and intention, necessarily known to Roberts and Houston, and taken advantage of by them to forward their own fraudulent purpose, that the cotton would be weighed in its name and be delivered by Houston to the Dixie Pickeries as its cotton, and would then be delivered to Dixie Pickeries in exchange for money equal to its value.

616

By analogy to the facts of *Mitchell* v. *State,* supra, and *Marler* v. *State,* supra, this fraudulent method of obtaining possession brings the co-conspirators, Roberts and Houston, within the offense of larceny as defined by Code Section 10923.

A burlap sack with a hole in it was offered in evidence by the defendant, presumably to lay the basis for argument that the tags found in the middle of the sack did not necessarily identify the cotton in that sack in that these tags could have gotten into that sack inadvertently or otherwise through the hole. As a matter of logic, such a theory seems to be very far fetched and artificial. Moreover, it does not appear that the sack involved here had a hole in it.

It is briefly contended that the Court erred in this excerpt taken from its charge: "The theory of the State is that on a date in 1949, that a bag of cotton, the property of Hohenberg Company, a corporation, engaged in the cotton business here in Memphis, Shelby County, Tennessee, was in their possession, and it was later identified as being their property at the Dixie Pickery Company, with a tag attached to it with the Defendant's name on it. The State contends by this proof that it has proven this defendant guilty beyond a reasonable doubt." It is said that this could all have been so and yet the defendant be "as innocent as a babe unborn."

■ His Honor was simply stating the theory of the State based upon the rule that the unexplained possession of property recently stolen created a presumption that the person in possesion is the one who committed the theft. We have read the entire charge of the Court. It was full and fair, and left the plaintiff in error nothing about which he is entitled to complain.

For the reasons stated, judgment must be affirmed. All concur.